# 25-2709-cv

## United States Court of Appeals

*for the*

## Second Circuit

———— •• ————

ALEX BERENSON,

*Plaintiff-Appellant,*

– v. –

DONALD TRUMP, President of the United States, in his official capacity, ANDREW M. SLAVITT, Senior Advisor to the COVID-19 Response Coordinator, in his official capacity, ROBERT FLAHERTY, Director of Digital Strategy at the White House, in his official capacity, VIVEK H. MURTHY, Surgeon General of the United States, in his official capacity, UNTIED STATES OF AMERICA,

*Defendants-Appellees,*

SCOTT GOTTLIEB, M.D., former FDA Commissioner and member of the Board of Directors of Pfizer, Inc., ALBERT BOURLA,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**APPELLANT'S APPENDIX**
**Volume 3 of 3 (Pages A-488 to A-555)**

JAMES R. LAWRENCE, III
ENVISAGE LAW
*Attorneys for Plaintiff-Appellant*
601 Oberlin Road, Suite 100
Raleigh, North Carolina 27608
(919) 268-8998

CP COUNSEL PRESS    (800) 4-APPEAL • (390026)

i

## TABLE OF CONTENTS

**Page**

**VOLUME 1 OF 3**

District Court Docket Sheet....................................... A-1

Complaint, filed April 14, 2023 ................................. A-23

Exhibit 1 to Complaint: Defendants' Objections and
   Responses to Plaintiff's First Set of Expedited
   Preliminary-Injunction Related Interrogatories to
   Robert Flaherty, in *The State of Missouri and the
   State of Louisiana v. President Joseph R. Biden,
   Jr.*, Civil Action No. 22-cv-1213 in the U.S.
   District Court for the Western District of
   Louisiana................................................... A-93

Declaration of Christopher R. Caudill in Support of
   Plaintiff Alex Berenson's Request for Leave to
   Amend, filed October 4, 2023 ............................... A-158

Memorandum in Opposition to Defendant Andrew
   M. Slavitt's Motion to Dismiss, filed October 4,
   2023 ....................................................... A-174

Declaration of Christopher R. Caudill in Support of
   Plaintiff Alex Berenson's Opposition to Andrew
   M. Slavitt's Motion to Dismiss for Lack of
   Personal Jurisdiction, filed October 4, 2023.......... A-204

Exhibit A to Caudill Declaration: Twitter Comments    A-207

Exhibit B to Caudill Declaration: Tiffany Lowe
   LinkedIn Profile....................................... A-209

Exhibit C to Caudill Declaration: Alex Berenson
   Twitter Comments.................................... A-222

ii

**Page**

Exhibit D to Caudill Declaration: Andy Slavitt
Twitter Comments..................................................... A-229

Exhibit E to Caudill Declaration: Fierce Healthcare
Special Report........................................................ A-232

Exhibit F to Caudill Declaration: Cityblock Website
Homepage .............................................................. A-236

Exhibit G to Caudill Declaration: Forbes Article,
"Town Hall Ventures Raises $350 Million More
as Underserved Care Strategy Take Off," by
Bruce Japsen, dated September 29, 2022 .............. A-247

Motion for Leave to File First Amended Complaint,
filed September 4, 2024 ......................................... A-253

**VOLUME 2 OF 3**

Attachment to Motion for Leave: First Amended
Complaint, filed September 4, 2024 ...................... A-255

Exhibit A to First Amended Complaint: Defendants'
Objections and Responses to Plaintiff's First Set
of Expedited Preliminary-Injunction Related
Interrogatories to Robert Flaherty, in *The State of
Missouri and the State of Louisiana v. President
Joseph R. Biden, Jr.*, Civil Action No. 22-cv-1213
in the U.S. District Court for the Western District
of Louisiana ........................................................... A-349

Exhibit B to First Amended Complaint: Email
Chain...................................................................... A-415

Twitter User Agreement............................................. A-443

Twitter COVID-19 Misleading Information Policy
March 2021............................................................. A-483

iii

**Page**

**VOLUME 3 OF 3**

Opinion and Order, filed July 14, 2025 ...................... A-488

Defendants' Letter to the Honorable Jessica G.L.
Clarke, filed August 1, 2025 .................................. A-540

Opinion and Order, filed September 29, 2025 ........... A-542

Judgment, filed September 30, 2025 ......................... A-553

Plaintiff's Notice of Appeal, filed
October 27, 2025 .................................................. A-554

A-488

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEX BERENSON,<br><br>                    Plaintiff,<br><br>          -against-<br><br>JOSEPH R. BIDEN, JR., et al.,<br><br>                    Defendants. | 23-CV-3048 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Alex Berenson is a journalist who reported on the COVID-19 vaccines during

2020 and 2021. He alleges that former President Biden and others in his administration, along

with executives at Pfizer, worked together to pressure Twitter (now simply known as "X") to

suspend Plaintiff's account, which he claims constitutes a violation of his First Amendment

rights.

All defendants moved to dismiss this action. However, after the 2024 presidential

election, several federal defendants in this action moved to stay this case to allow the new

administration to re-assess its position. Defendants Andrew Slavitt (former White House senior

advisor), and Scott Gottlieb and Albert Bourla (both executives at Pfizer, collectively the "Pfizer

Defendants," and together with Slavitt the "Non-Stayed Defendants") opposed that stay request.

The Court therefore granted the requested stay as to the federal defendants only.

As set forth below, the Non-Stayed Defendants' motions to dismiss are GRANTED.

Plaintiff lacks standing to assert a First Amendment claim against Slavitt because Berenson

cannot obtain equitable relief or *Bivens* monetary damages against him. Plaintiff also fails to

state a claim under 42 U.S.C. § 1985(3) because he has not plausibly alleged the existence of a

cognizable protected class, or any discriminatory animus by the Non-Stayed Defendants. Nor has

Plaintiff stated a claim for tortious interference under New York law because he has not sufficiently alleged facts demonstrating a breach of a contract. Plaintiff's claims against the Non-Stayed Defendants are thus dismissed without leave to replead, given that the parties' briefing addressed Plaintiff's additional allegations in his Proposed First Amended Complaint. Further amendment would therefore be futile.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the Complaint and presumed to be true for the purposes of the instant motions. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Plaintiff's proffered additional allegations contained in the Proposed First Amended Complaint (ECF No. 80-1, the "PFAC") are also considered and taken as true.

## I.     The Parties[1]

Plaintiff Alex Berenson is an independent journalist and author. PFAC ¶ 39. He publishes on Twitter and Substack and recently wrote a book regarding the public policy response to the COVID-19 pandemic. *Id*. He is a resident of New York. *Id*.

Defendant Joseph R. Biden, Jr., is the former-President of the United States, and has been sued only in his official capacity. *Id*. ¶ 40. Former President Biden is automatically replaced in his official capacity as a defendant in this case with Donald J. Trump, pursuant to Rule 25 of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d).

---

[1] Given the change in administration since this action was first filed, Federal Rule of Civil Procedure 25(d) will necessitate substitutions of any Defendant sued in their official capacity. Rule 25 enacts these substitutions automatically, and so the Court will take judicial notice of subsequent appointments for these roles as necessary and note these substitutions in the factual recitation that follows. *See* FED. R. CIV. P. 25(d); *Karcher v. May*, 484 U.S. 72, 83 (1987) (observing that Rule 25 is "designed to prevent suits involving public officers from becoming moot due to personnel changes.").

A-490

Defendant Andrew Slavitt is a resident of California and served as the White House Senior Advisor for the COVID-19 response from January 2021 through June 2021. PFAC ¶ 41. Thereafter, Slavitt worked as the general partner of a private equity fund in New York, New York and published a book. *Id*. ¶ 47. Slavitt is now only sued in his individual capacity.[2] *Id*. ¶ 41. Because Slavitt's position was never re-filled, the United States of America has replaced Slavitt in his official capacity as a defendant. ECF No. 30.

Defendant Rob Flaherty was the Director of Digital Strategy at the White House. PFAC ¶ 42. Defendant Christian L. Tom then replaced Flaherty in his official capacity as a defendant. ECF No. 30.[3] Defendant Tom is no longer the Director of the White House Office of Digital Strategy and does not appear to have been replaced in the Trump Administration. Therefore, Flaherty is now sued only in his individual capacity. PFAC ¶ 42, and the United States of America replaces Mr. Flaherty in his official capacity as a defendant. ECF No. 30.

Defendant Vivek Murthy, M.D., is the former Surgeon General of the United States. PFAC ¶ 43. He is sued in his individual capacity. *Id*. Denise Hinton, who is the acting deputy U.S. Surgeon General, replaces Murthy in his official capacity as defendant pursuant to FRCP 25.

---

[2] Slavitt no longer holds the position of Senior Advisor to the COVID-19 Response Coordinator and is no longer employed in any capacity by the United States Government. ECF No. 30 at 2. No successor has been named for him, and his duties and responsibilities for which he was named as a defendant have not been reassigned. Accordingly, there is no official capacity claim pending against Slavitt. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 555 n.6 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

[3] Pursuant to Federal Rule of Civil Procedure 25(d), Tom was substituted as the successor for Flaherty in his official capacity as Director of Digital Strategy at the White House, because Flaherty no longer holds that position and is no longer employed in any capacity by the United States Government. ECF No. 30 at 1. Accordingly, there is no official capacity claim pending against Flaherty.

A-491

Defendant Scott Gottlieb, M.D. serves on Pfizer's Board of Directors and is a member of Pfizer's Executive Committee and Regulatory & Compliance Committee. *Id.* ¶¶ 44, 159. Prior to joining Pfizer in 2019, Gottlieb was the Commissioner of the Food and Drug Administration. *Id.* ¶ 158. Gottlieb is a resident of Connecticut. *Id.* ¶ 44. Defendant Albert Bourla, Ph.D., D.V.M., is the Chief Executive Officer of Pfizer. *Id.* ¶ 45. Bourla is a resident of Connecticut. *Id.* Both Gottlieb and Bourla are sued individually.

## II.    The Alleged Conspiracy

Berenson alleges that Defendants "engaged in a nearly unprecedented conspiracy to suppress [his] First Amendment rights" by "work[ing] together to pressure Twitter to suspend [his] account and mute his voice as a leading COVID-19 vaccine skeptic." *Id.* ¶ 2. Twitter is a social media platform that allows users to electronically send messages of limited length to the public. *Id.* ¶ 57. Users may post their own messages (tweet), respond to messages of others (reply), republish the messages of others (retweet) and convey approval or acknowledgement of another's message by "liking" the message. *Id.* Hundreds of millions of people utilize Twitter, with around one in five adults in the United States saying that they use Twitter. *Id.* ¶ 58. Twitter, at various points, instituted and maintained content moderation policies by which certain tweets would be reviewed for harmful or misleading content. *Id.* ¶¶ 76–77, 86, 91. Twitter users were required to abide by the Terms of Service. *See, e.g.,* ECF No. 96-1 (August 2021 Twitter User Agreement and Terms of Service).

Berenson joined Twitter in November 2009. PFAC ¶ 71. In March 2020, along with many others, Berenson's attention turned toward COVID-19. *Id.* ¶ 72. That same month, Twitter's Head of Trust and Safety announced in a blog post that Twitter was "broadening [its] definition

4

A-492

of harm to address content that goes directly against guidance from authoritative sources of global and local public health information." *Id.* ¶ 76.

On March 26, 2020, Berenson published a six-tweet thread discussing a model published by the Imperial College London ("ICL"), which looked at mortality estimates due to COVID-19. *Id.* ¶ 73. Two days later, the Director of Media Relations for ICL sent an email to Twitter regarding Berenson's six-tweet thread, characterizing it as "extremely popular and dangerously misleading." *Id.* ¶ 74. ICL's Media Relations Director wrote that Berenson's claims, which started on Twitter, had become popular elsewhere, putting lives at risk. *Id.* Twitter reviewed Berenson's thread and the context surrounding it, deciding not to take action on his account at that time because it did not violate the COVID-19 misleading information policy. *Id.* ¶ 75.

On May 11, 2020, Twitter explained in another blog post that it "may use labels and warning messages to provide additional explanations or clarifications in situations" related to COVID-19 information. *Id.* ¶ 77. Berenson tweeted his concerns about Twitter's May 2020 labeling policy regarding free speech, after which Twitter's then Vice President of Global Communications, Brandon Borrman, reached out to Berenson and requested a discussion. *Id.* ¶¶ 78–79. Borrman noted that Twitter was "trying to take a more nuanced approach" that recognized "there is a huge amount of emotion and vitriol on all sides of the issue" and that Twitter was "trying to make sure that factual debate finds a way through the emotion, but we're obviously not successful all the time." *Id.* ¶ 81.

Due at least in part to these statements, Berenson continued to report about COVID-19 on Twitter throughout 2020. *Id.* ¶ 82. In November 2020, Berenson tweeted analyses of lockdowns and mask mandates, and questioned other non-pharmaceutical interventions such as contact tracing, calling them "useless." *Id.* Following Pfizer and BioNTech's positive clinical trial results

5

regarding their COVID-19 vaccine, Berenson tweeted that while "more safety data" was needed, "this is legitimately good news," and following Moderna's release of clinical trial results regarding its vaccine candidate, Berenson tweeted that it was "more good topline vaccine news." *Id*. ¶¶ 84–85.

In December 2020, Twitter announced a new policy regarding misleading COVID-19 vaccine information; specifically, Twitter would "remove Tweets which advance harmful or misleading narratives about COVID-19 vaccinations" including:

- False claims that suggest immunizations and vaccines are used to intentionally cause harm to or control populations, including statements about vaccines that invoke a deliberate conspiracy;

- False claims which have been widely debunked about the adverse impacts or effects of receiving vaccinations; or

- False claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary.

*Id*. ¶ 86. Twitter explained that it might "label or place a warning on Tweets that advance unsubstantiated rumors, disputed claims, as well as incomplete or out-of-context information." *Id*.

Around the same time, Twitter promulgated a new COVID-19 misleading information policy to specifically address the COVID-19 vaccines. *Id*. The policy explained that Twitter was "enforcing this policy *in close coordination with trusted partners*, including public health authorities, NGOs and *governments*" and that Twitter would "continue to use and consult with information from those sources when reviewing content." *Id*. ¶ 87.

Again concerned that the new policy might mean that Twitter would censor him, Berenson contacted Borrman on December 17, 2020, looking for assurances that Twitter would continue to allow his reporting on COVID-19 vaccines. *Id*. ¶ 88. Berenson told Twitter that although people were complaining about questions he was raising about the vaccine, Berenson

6

was not tweeting "conspiracy theory nonsense" and "everything [he] point[ed] to about safety comes from the clinical trial data." *Id*. Borrman responded that the "points you're raising should not be an issue at all" and that the "policy is designed to allow debate and discussion, but to discourage conspiracy theories, etc." *Id*. ¶ 89.

On March 1, 2021, Twitter announced a five-strike policy as part of the bar on medical misinformation (the "COVID-19 Misleading Information Policy"), which stated that accounts which committed repeated violations of the policy would be "subject to increasing levels of discipline, up to and including permanent suspension for five or more violations." *Id.* ¶ 91; *see* ECF No. 96-4. [4] Specifically, the policy provided that no action would be taken after the first strike, a 12-hour account lock would occur after the second and third strikes, a seven-day account lock would occur after the fourth strike and the account would be permanently suspended after the fifth strike.

Berenson once again contacted Borrman at Twitter seeking assurances that he could continue reporting on COVID-19 on Twitter. PFAC ¶ 92. Borrman responded to Berenson stating that: "I will say that your name has never come up in the discussions around these policies" and that: "[i]f it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed. If something happens, please let me know." *Id*. ¶ 93.

---

[4] The Court may properly consider the COVID-19 Misleading Information Policy in deciding the instant motions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . [and] [e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.").

A-495

In mid-March 2021, Twitter sent an inquiry from a journalist to its Global Escalation Team ("GET"), which handles complaints about tweets. *Id*. ¶ 94. GET reviewed Berenson's account and found that although Berenson "leverages individual data points from a combination of various sources (some authoritative, others not), he avoids making demonstrably false or misleading claims about COVID-19 vaccines." *Id*. (emphasis omitted). A Twitter employee confirmed that the analysis was the result of a "deep dive" into Berenson's account. *Id*. ¶ 95. (emphasis omitted). The same employee noted that Twitter took action on one of Berenson's tweets, consistent with Twitter's past enforcement of their policy. *Id*. Berenson alleges he did not receive notice of this first strike. *Id*. Berenson's tweets suggested that the mRNA vaccine is gene therapy and thus would alter genetic code. *Id*.

On April 21, 2021, Biden Administration officials, including Defendants Flaherty and Slavitt, met with four of Twitter's employees, including the Head of Government Affairs for the United States and Canada (the "April 2021 Meeting"). *Id*. ¶ 115. The meeting had been initiated by Flaherty. *Id.* The Head of Government Affairs has since stated that "one of the first meeting requests from the Biden White House was about COVID-19 misinformation . . . Biden's staff focused on vaccines and high-profile anti-vaxxer accounts, including Alex Berenson." *Id*. The meeting invitation noted that the White House would be briefed by Twitter on vaccine misinformation, with Twitter covering "trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work." *Id*. ¶ 116.

The next day, in a discussion on Slack among Twitter employees, one employee wrote that the White House "had one really tough question about why Alex Berenson hadn't been

8

A-496

kicked off the platform; otherwise their questions were pointed but fair – and mercifully we had answers." *Id*. ¶ 117. The employee also wrote that the White House "allege[s] that they've done some data visualization that shows [Berenson's], like, ground zero for covid misinformation that radiates outward." *Id*. ¶ 118. A different employee wrote that the White House "really wanted to know about Alex Berenson" and that "Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id*. ¶ 119. Other messages in the Slack stated "I've taken a pretty close look at his account and I don't think any of it's violative" but that "[w]e told [Slavitt]" "that we'd ask you to take a look." *Id*. ¶ 122. When asked whether the employee had given Berenson's account "a thorough vetting recently," the employee responded "[l]ast month" and that Berenson's account was "referencing science and statistics." *Id*.

Flaherty recalls that at the April 21, 2021 meeting, Slavitt expressed his view that Twitter was not enforcing its content guidelines with respect to Berenson's tweets and that Twitter employees disagreed with Slavitt's view. ECF No. 80-3 at 57[5]. Flaherty also recalls Slavitt suggesting that Flaherty would follow up with Twitter about Berenson, but Flaherty does not recall following up. *Id*. Flaherty further remembers a Twitter employee calling approximately one or two weeks after the meeting to indicate that Twitter would not be removing Berenson because Berenson had not violated Twitter policies at that time. *Id*. Slavitt has stated that "I'm sure that [Berenson's] name was brought up as one of the examples" discussed during the April 21, 2021 meeting. PFAC ¶ 124.

---

[5] The Court may properly consider this as well because it is an exhibit to the PFAC. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

A-497

At one point, Twitter's Head of Government Affairs wrote that the "Biden White House was not satisfied with Twitter's enforcement approach as they wanted Twitter to do more and to de-platform several accounts. Because of this dissatisfaction, we were asked to join several other calls. They were very angry in nature." *Id.* ¶ 127. (emphasis omitted). Berenson alleges that White House staff, including Flaherty and Slavitt, joined these "angry" calls with Twitter staff "urging the platform to censor Mr. Berenson's speech." *Id.* ¶ 242(b).

### III.    Alleged Public Pressure Campaign

Berenson alleges that there was a public pressure campaign from the Biden Administration in support of the COVID-19 vaccine and against social media companies. *Id.* ¶ 142. Soon after taking office, Biden called the COVID-19 vaccination campaign "a wartime effort." *Id.* ¶ 97. Biden's senior advisors spoke about the safety and efficacy of the vaccines, and the life-or-death stakes regarding vaccination. *Id.* ¶ 99. An email from Flaherty to YouTube executives noted that concerns regarding vaccine hesitancy were "shared at *the highest (and I mean the highest) levels* of the White House." *Id.* ¶ 109. Flaherty also emailed Facebook executives asking, "[w]hat interventions are being taken on 'skepticism?' I could see a range of actions . . . ." *Id.* ¶ 111. In February 2021, during remarks at a Pfizer manufacturing facility, Biden thanked Bourla for "what you do," noting that it was a matter of "life and death." *Id.* ¶ 98.

In July 2021, after the "initial pressure campaign failed," Berenson claims, "the conspiracy to censor Mr. Berenson took on new urgency." *Id.* ¶¶ 11, 16. On July 12, 2021, Slavitt, who no longer worked at the White House, referred to Berenson negatively during an appearance he made on a television network. *Id.* ¶ 139–40. Slavitt stated that he knew "nobody more worthy of being ignored than Alex Berenson" and that Berenson didn't "really care whether [the vaccine was] good for people or bad for people." *Id.* ¶ 140.

10

On July 15, 2021, Murthy published a report in which he noted that although there have been significant efforts to address health misinformation, such as Twitter's COVID-19 Misleading Information Policy, much more needed to be done. *Id*. ¶ 142. In the report, Murthy called for social media platforms to "prioritize early detection of misinformation 'super-spreaders' and repeat offenders," and recommended that the platforms "impose clear consequences for accounts that repeatedly violate platform policies." *Id*. Slavitt would later invite Murthy onto Slavitt's podcast to discuss the report. *Id.* ¶ 143. During that appearance, Murthy stated that he thought that social media platforms had a duty to act, because there was "significant harm coming from social media platforms that don't have strong enough guardrails and measures to reduce the flow of misinformation." *Id*. ¶ 144. Murthy also stated that "free speech is a bedrock value of our country . . . [b]ut that doesn't mean that we need to allow misinformation that we know harms people's health to run rampant." *Id*. ¶ 145. (emphasis omitted).

Murthy also appeared at a White House press briefing on July 15, 2021 to discuss his report. *Id*. ¶ 146. At the same July 15 press conference, the White House Press Secretary stated that the federal government was in regular touch with social media platforms and had proposed changes to them, such as that the platforms "create a robust enforcement strategy that bridges their properties and provides transparency." *Id*. At a briefing the next day on July 16, the Press Secretary stated that "any decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies." *Id*. ¶ 147. (emphasis omitted). Around the same time, in response to a reporter who asked "[o]n COVID-19 misinformation, what's your message to platforms like Facebook," Biden responded "[t]hey're killing people." *Id*. ¶ 148.

11

Also on July 16, 2021, Twitter locked Berenson's account, resulting from the second strike under the COVID-19 Misleading Information Policy. *Id*. ¶ 149. The strike followed a tweet that stated "Something really odd is going on. The vaccines are failing." *Id*. ¶ 165. Twitter chief executive Jack Dorsey indicated that this second strike did not seem right to him because Berenson only made queries. *Id.* ¶ 183. After the second strike, Jack Dorsey and Vijaya Gadde (Twitter's then Head of Trust and Safety) "became increasingly actively involved in the discussions" around Berenson's account. *Id*.

Four days later, the White House Communications Director stated that social media platforms "should certainly be held accountable" for spreading misinformation and that Biden has spoken "very aggressively" about the issue. *Id*. ¶ 151. The Communications Director also raised the possibility of a potential reform of Section 230 of the Communications Decency Act, which shields online platforms from responsibility for what is posted on their sites by third parties. *Id*. ¶¶ 151–52. A news report noted that the government was "examining how misinformation fits into the liability protections granted by Section 230." *Id*. ¶ 150. Twitter has stated that restricting the scope of Section 230 could potentially result in increased liability for content moderation decisions and third-party content posted on Twitter, as well as higher litigation costs. *Id*. ¶ 152. Berenson alleges that the "federal government's threats to change [S]ection 230 struck at the heart of Twitter's business model, putting additional pressure on the platform" to censor him. *Id*.

On July 18, 2021, Berenson alleges that Slavitt wrote to a man named Todd O'Boyle, an alleged Twitter lobbyist who "fielded the initial White House request to ban" Berenson. *Id*. ¶ 22. Slavitt asked O'Boyle for time so that he could introduce O'Boyle to Dr. Gottlieb (another non-government employee), and O'Boyle responded he would schedule a conference call for the

A-500

individuals to discuss a "policy matter," which was later identified as Berenson's Twitter activity. *Id*. Although Slavitt no longer worked at the White House at this time, his email signature line included, "For Government Email, Please Send to Andrew.M.Slavitt@who.eop.Gov." *Id.* ¶ 166.

The next day on July 19, 2021, Gottlieb emailed O'Boyle saying he had a "high regard" for the role Twitter plays in informing the public, but was growing concerned about certain accounts "fueling dangerous and false narratives" on "public health issues related to the pandemic." *Id.* ¶ 167. Gottlieb suggested that Twitter had an affirmative obligation with respect to these accounts and circumstances. *Id.* ¶ 169. Berenson alleges, on information and belief, that Gottlieb intended to refer to Berenson, among others. *Id.* ¶ 168. Related to this email, O'Boyle spoke to Flaherty, and told him Twitter would follow a "whole-of-society" approach to COVID-19 misinformation. *Id.* ¶ 173. Berenson alleges this statement meant that Twitter would respond to the federal government in order to achieve the Biden Administration's policy goals. *Id.* Berenson alleges that Twitter made this decision, at least in part, in response to an email from Gottlieb in which Gottlieb suggested that he was going to discuss the views he previously espoused in his July 19 email on an upcoming television appearance. *Id.* ¶¶ 167–68, 170. O'Boyle forwarded the email to Lauren Culbertson (Twitter's top U.S. lobbyist), who then forwarded it to Jessica Herrera Flanigan (Twitter's Vice President of Public Policy for the Americas) and commented:

> Heads up that we **could be** next. Todd and I are triaging. The other backchanneling suggests that we're on much better footing than [Facebook] but need to keep up the responsiveness. I'll let you know if we think it's going to go sideways. Hopefully, we can keep us in a good place.

*Id.* ¶ 170.

On July 20, 2021, Culbertson forwarded an article regarding the above-described press release regarding Section 230 (*id.* ¶¶ 151–52) saying they met with Murthy's office and

13

A-501

established a "positive partnership." *Id.* ¶ 153. Even so, Culbertson wrote she was working on a "playbook" in case the Biden Administration decided "to turn on Twitter." *Id.* ¶ 154. Culbertson also e-mailed Twitter's Vice President of Global Public Policy, Monique Meche, regarding a proposed Section 230 bill by Senator Amy Klobuchar, saying the bill "does not have a chance of passing at this point in time" but that Culbertson would "be proactive and vigilant about protecting [Section] 230." ECF No. 80-4 at TWTR_BERENSON_0001460. But the overall strategy, according to Culbertson, was "to be productive, responsive, and honest partners to the Biden Administration" and keep "this under the radar and behind the scenes as much as possible." PFAC ¶ 154.

Throughout late July 2021, Slavitt communicated with O'Boyle regarding Berenson's tweets. *Id.* ¶ 23. On July 28, 2021, Slavitt emailed a screenshot of Berenson's tweet that said "You know what immunizes you against #SARS_CoV_2? Quickly, efficiently, and with low risk to healthy non-elderly people? Getting #SARS_CoV_2." ECF No. 53 at 5. Slavitt sent this screenshot to an individual at Twitter, merely stating "[b]egging for it." ECF No. 53 at 5[6]; PFAC ¶ 242(c). Twitter had issued a third strike against Berenson just one day prior, presumably because of the same tweet that Slavitt identified in his email. PFAC ¶ 174. Slavitt contacted Twitter after the third strike, writing that Berenson "knows he's gone" and that Berenson was just "milking Twitter for audience." *Id*. Around the same time, Slavitt stated in an interview that "[I am] on the phone with and talking to the White House and the CDC . . . as often as people need me and usually that's on a daily basis when things get to crunch time." *Id.* ¶ 157.

---

[6] This screenshot from Plaintiff's opposition to Slavitt's original motion to dismiss does not appear in the opposition to the renewed motion to dismiss or the PFAC. However, the PFAC still references the text of this tweet, *see* PFAC ¶ 242(c), and so the Court will consider it as integral to the PFAC by way of its reference.

14

A-502

Also on July 28, 2021, Bourla appeared on Slavitt's podcast. *Id.* ¶ 175. On that podcast episode, Slavitt noted that vaccine mandates were something that he had been working on. *Id.* ¶ 176. The same day, Bourla traveled to the White House for a meeting that had been scheduled one day before. *Id*. ¶ 178. Berenson alleges, upon information and belief, that the agenda for the meeting included COVID-19 booster shots and vaccine skepticism. *Id*.

Berenson publicly criticized Slavitt (by "tagging" his handle on Twitter) for his view on vaccine mandates and also questioned his credibility. *Id.* ¶ 180. Around the same time, on July 29, 2021, Berenson tweeted:

> The pivotal clinical trial for the @pfizer #COVID-19 vaccine shows it does nothing to reduce the overall risk of death. ZERO.
>
> 15 patients who received the vaccine died; 14 who received placebo died.
>
> The end.
>
> The trial blind is broken now. This is all the data we will ever have.

*Id*. ¶ 180. On July 30, 2021, the tweet was originally flagged, but a senior Twitter Trust and Safety employee instructed that the label be removed for the time being. *Id.* ¶ 184. Twitter considered giving Berenson another strike, and Culbertson stated it "would be ideal to move fast" to issue a fourth strike against Berenson's account. *Id.* ¶ 187. Berenson later received his fourth strike from Twitter based on the above July 29 tweet, which resulted in a seven-day suspension. *Id*. ¶ 181. Also on July 30, 2021, a Twitter employee emailed Slavitt a link to Berenson's July 29, 2021 tweet along with the message: "He's on a 7 day suspension. Further violations of the rules will result in permanent suspension." *Id*. ¶ 182. An attorney for Twitter later wrote that the employee "probably" should not have shared this information about Berenson's account. ECF No. 50-1 at 1.

On July 31, 2021, Slavitt emailed a Twitter employee saying "[i]f he doesn't go permanently after this, the outcry will be justified," in reference to a tweet by Berenson. *Id.* ¶ 188. By "this," Slavitt presumably referred to a screenshot he attached to his email which showed a tweet from Berenson that stated "[i]mpfung macht frei," which translates to "vaccines make free." *Id.* ¶ 189. Berenson's tweet likely refers to the words written on the gates of the Auschwitz concentration camp, "arbeit macht frei" which translates to "work makes free." *Id.* After Berenson's fourth strike, Gadde told Dorsey that Twitter was considering updates to enforcement guidance to allow for more criticism of vaccines. *Id.* ¶ 186.

In late August 2021 (around the time Pfizer got FDA approval for its COVID-19 vaccine) Slavitt, Gottlieb, and "the White House" contacted O'Boyle regarding Twitter's efforts to "elevate the conversation about covid and vaccines." *Id.* ¶ 25. O'Boyle confirmed this internally, writing to Culbertson that he fielded inquiries from Slavitt, Gottlieb, and the White House on Twitter's approach. ECF No. 80-4 at TWTR_BERENSON_0003969. O'Boyle explained he wanted "key players" to know "all the good work" Twitter was doing to "elevate the conversation about covid and vaccines." *Id.*; PFAC ¶ 193. In that email, O'Boyle described Slavitt as the "former WH advisor (and frequent cable talker) . . . " *Id.* O'Boyle also described Gottlieb in a similar fashion. *Id.*

On August 24, Gottlieb emailed O'Boyle to "complain" about Berenson's work, writing "[t]his is why [Dr. Fauci] needs a security detail." *Id.* ¶ 26, 194. On the same day, O'Boyle scheduled a conference call to occur between Gottlieb and Lauren Culbertson (O'Boyle's supervisor at Twitter). *Id.* ¶ 27. During the call, Gottlieb inquired about Berenson's continued access to the Twitter, and O'Boyle explained Berenson was on his last strike before a permanent ban. *Id.* Three days later, Gottlieb and a Twitter employee had a call. *Id.* ¶ 197. Messages on

16

A-504

Twitter's Slack channel during the call contain a reference to "Berenson 4th COVID-19 strike as of 7/27." *Id.* ¶ 198.

Just a few days later, Berenson received his fifth and final strike. *Id.* ¶ 205. On August 28, 2021, Berenson tweeted:

> It doesn't stop infection. Or transmission.
>
> Don't think of it as a vaccine.
>
> Think of it—at best—as a therapeutic with a limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS.
>
> And we want to mandate it? Insanity.

*Id.* ¶ 200. Gottlieb emailed the tweet to O'Boyle. *Id.* O'Boyle then sent Gottlieb's email to Twitter moderators, referring to it as a "partner report" and asking for an explanation if the moderators decided not to give it a strike. *Id.* ¶ 204. The tweet was then sent to a member of Twitter's "Strategic Response Team," who labeled the tweet as misleading. *Id.* O'Boyle responded "was it strike eligible" and "[i]s this not the fifth strike under the policy?" *Id.* The employee then reported to O'Boyle that Berenson's account received its fifth strike and was permanently banned. *Id.* ¶ 205. O'Boyle flagged the suspension for Twitter's in-house legal team, and he credited Gottlieb in tipping him off to the tweet. *Id.* ¶ 206. Specifically, O'Boyle wrote that he escalated Berenson's tweet "based on a report by former FDA Commissioner Scott Gottlieb . . . ." ECF No. 80-4 at TWTR_BERENSON_0003956; PFAC ¶ 206. Shortly after the suspension, Slavitt tweeted a picture showing Berenson had been suspended. PFAC ¶ 207.

At the time Berenson's suspension became public (including a statement from Twitter that Berenson had been suspended for repeated violations of the Company's COVID-19 misinformation rules), Gadde, Dorsey, and other senior Twitter managers were not aware Berenson had been banned. *Id.* ¶¶ 208–09. That evening, a member of Twitter's Site Integrity

17

A-505

Unit ("SIU") corresponded with Gadde. ECF No. 80-4 at TWTR_BERENSON_0004019. The SIU employee noted, among other things, that SIU was aligned with the decision that Berenson's tweet was "in violation of the COVID-19 misinformation policy" and that SIU had "previously enforced the policy related to this type of claim." *Id.*

The following morning, Gadde told a senior manager in SIU that Berenson should not have been banned and that Dorsey did not believe the correct decision had been made. PFAC ¶ 210. Gadde also wrote "[f]rom the beginning, we have wanted to leave room for people to have discussion in this space, and certainly discussion around vaccine mandates feels like an area we should allow to happen." *Id.* The senior manager agreed and stated Twitter would rescind the strike and restore Berenson's account if he appealed. *Id.*

**IV.    Events Following Berenson's Ban and the Ban's Alleged Impact**

Berenson alleges that the effect of his suspension was immediate, concrete, and negative. *Id.* ¶ 223. He lost access to more than 300,000 Twitter followers, the opportunity to engage with government and public health officials on Twitter, the ability to promote his longer form journalism on Substack and the opportunity to promote his book on the pandemic. *Id.* Berenson alleges that his ban, as implemented, prevented his readers from seeing his earlier reporting. *Id.* ¶ 3. Indeed, Berenson alleges the suspension permanently erased all his previous reporting from Twitter. *Id.* ¶ 202.

In December 2021, Berenson sued Twitter in federal district court, bringing multiple claims relating to Berenson's permanent suspension from the platform. PFAC ¶ 225; *see also* Complaint, *Berenson v. Twitter, Inc.*, No. 21-CV-9818 (WHA) (N.D. Cal. Dec. 20, 2021), ECF No. 1. On July 6, 2022, Berenson and Twitter settled the suit, with Twitter reinstating Berenson to the platform. PFAC ¶ 225. Twitter also issued a public statement that "[u]pon further review,

18

Twitter acknowledges Mr. Berenson's Tweets should not have led [to] his suspension at that time." *Id.*

Specific to this action, Berenson alleges that Biden, Slavitt, Flaherty, and Murthy "created an atmosphere of censorship to facilitate Mr. Berenson's suspension from Twitter." *Id.* ¶ 241. Berenson further alleges that the conspiracy to deplatform him from Twitter had both public and private arms. *Id.* ¶ 19. Berenson alleges that privately, Slavitt urged Twitter to act against Berenson and publicly, Defendants avoided mentioning Berenson by name, but "harshly attacked Twitter and other platforms for allowing skepticism about the COVID-19 vaccines, which they labeled 'misinformation.'" *Id.*

Defendants, not all members of the Biden Administration, remained in touch with each other. *Id.* ¶¶ 18–19. Berenson alleges that Slavitt remained close to White House officials, including Vivek Murthy, after leaving his position at the White House. *Id.* ¶ 17. Berenson additionally alleges that Slavitt had a close relationship with Gottlieb, with the two authoring papers together. *Id.* ¶ 18. Murthy, Gottlieb, and Bourla have all appeared on Slavitt's podcast. *Id.* Gottlieb also appeared on interviews with Slavitt and the two further co-authored a letter to Congress calling for a $46.5 billion program for contact tracing and "voluntary self-isolation" for peopled with COVID-19." *Id.* ¶ 161.

Berenson alleges that Twitter's ban of his account harmed a "clearly identifiable class of nearly 100 million Americans whose interests he helped represent—Americans who either had questions about the vaccine or did not want to be forced to take a shot that they feared had been rushed through development and lost its ability to prevent COVID-19 infections within months." *Id.* ¶ 6. Berenson claims that in his journalism and reporting, he was "speaking on behalf of an identifiable class of Americans who had chosen not to receive a COVID-19 vaccine." *Id.* ¶ 252.

He alleges that "[t]his class of unvaccinated Americans includes a disproportionate number of African-Americans, political conservatives, and evangelical Christians." *Id*. Berenson has not taken any of the COVID-19 vaccines. *Id.* ¶ 39.

Berenson further alleges that unless and until Defendants are enjoined, Berenson's rights remain under threat because "President Biden and his Administration continue to view COVID-19 vaccination as a life-saving measure, and thus the federal government might continue or start anew its efforts to silence Mr. Berenson, who has since returned to Twitter." *Id.* ¶ 229. Berenson claims that he "remains at risk from future government censorship efforts . . . [because] Defendants targeted Mr. Berenson once before, and there is no reason to think they will not do so again." *Id*. ¶ 233. He further alleges that the claimed violations "may and are likely to recur unless the government Defendants are enjoined." *Id*. ¶ 248. Berenson emphasizes these concerns are not speculative, and alleges that as recently as July 6, 2024, Berenson wrote an article that a Parkinson's disease specialist had made several trips to the White House. *Id.* ¶ 234. Berenson claims the Biden Administration retaliated against him by denying his request to tour the White House. *Id.* ¶¶ 235, 236.

## V.    Allegations Regarding Other Social Media Companies

Berenson alleges that Defendants also pressured other social media companies, like Facebook and Amazon, regarding similar issues (although not with respect to any posts he made). *Id.* ¶ 129. For instance, in March 2021, Berenson alleges that Amazon made changes to its bookstore policies to "placate" the Biden Administration. *Id.* On April 18, 2021, Berenson alleges that Facebook executive Nick Clegg had an hour-long conversation with Slavitt in which Slavitt was "outraged" that a particular post—purportedly making a joke about long term effects

A-508

of the COVID-19 vaccine—was not removed. *Id.* ¶ 125. Clegg responded that removing content like this would risk intrusion on free expression. *Id.* ¶ 126.

Berenson also alleges that Slavitt was in close contact with a senior Facebook executive "[t]hrough at least late July" of 2021 and "pressured" Facebook "for months" to censor COVID-19 content. *Id.* ¶¶ 17, 129. Mark Zuckerberg, Chief Executive Officer of Facebook, recently stated in testimony to Congress that "senior officials from the Biden Administration, including the White House, repeatedly pressured our teams for months to censor certain COVID-19 content." *Id.*¶ 129.

## VI.    Procedural History

Berenson originally filed this action on April 12, 2023 against then President Biden in his official capacity, Defendants Slavitt, Flaherty, and Murthy in their official and individual capacities, and Defendants Gottlieb and Bourla alleging they formed a conspiracy to suppress his speech and terminate his Twitter account based on his views on COVID-19 and vaccines. ECF Nos. 1, 3 ("Compl."). The original complaint alleges a violation of the First Amendment and the Ku Klux Klan Act, 42 U.S.C. § 1985(3) ("Section 1985"), as well as a claim for tortious interference. ECF No. 1 ("Compl.") ¶¶ 188–217. The Complaint sought a declaratory judgment that Defendants violated Berenson's First Amendment rights, an injunction preventing further violations, and a variety of damages along with attorneys' fees and costs. Compl. at 95–96.

On August 21, 2023, all Defendants filed motions to dismiss the original complaint. ECF Nos. 38, 40, 44. On December 8, 2023, Defendants Slavitt, Bourla, and Gottlieb filed a motion to stay discovery pending resolution of the motions to dismiss. ECF No. 67. On March 19, 2024, the Court stayed the entire action due to the pendency of two cases before the Supreme Court: *Murthy v. Missouri*, No. 23-411, and *National Rifle Association v. Vullo*, No. 22-842. ECF No.

21

71. *Murthy* and *NRA* involved nearly identical issues with respect to Berenson's First Amendment claims, and were therefore highly likely to affect the outcome of the instant case. *Id.* After the Supreme Court rendered a decision in those actions on May 30, 2024 and June 26, 2024, respectively, the Court scheduled oral argument on the then pending motions to dismiss to occur on September 12, 2024. ECF No. 75.

On September 4, 2024—about a week before oral argument was scheduled to occur—Plaintiff filed a motion for leave to file an amended complaint. ECF No. 80. The Court construed the motion as "mooting the underlying motions to dismiss" and therefore cancelled the scheduled oral argument. ECF No. 82. In the same order, the Court instituted a new briefing schedule for the Defendants' renewed motions to dismiss, and lifted the stay previously entered in March 2024. *Id.*

The Proposed First Amended Complaint asserts the same causes of action. PFAC ¶¶ 238–267. Defendants filed renewed motions to dismiss on October 11, 2024. ECF Nos. 89, 90 ("Slavitt MTD"); ECF Nos. 94, 95 ("Pfizer Defs. MTD"); ECF Nos. 97, 98 ("Fed. Defs. MTD"). Plaintiff filed an opposition to each. ECF Nos. 102 ("Opp. to Fed. Defs."), 103 ("Opp. to Slavitt."), 104 ("Opp. to Pfizer Defs."). Defendants timely filed replies in further support of the renewed MTDs. ECF Nos. 107 ("Slavitt Reply"), ECF Nos. 109 ("Pfizer Defs. Reply"); 110 ("Fed Defs. Reply").

The parties have also filed various supplemental authority letters—and responses to such letters—after the motions were fully briefed. ECF Nos. 113, 114, 117–121. These letters mainly relate to Plaintiff's Section 1985 claim. Plaintiff also filed a letter motion to add more allegations to the PFAC should the Court permit him leave to amend, which Defendant Slavitt opposed. ECF Nos. 115, 116.

22

A-510

The Court scheduled oral argument to take place on April 23, 2025. On April 16, 2025, the Federal Defendants filed a letter motion requesting a temporary stay of the case for three months. ECF No. 122. Plaintiff consented to the requested stay, but the remaining Defendants opposed, citing concerns about prejudice and unreasonable delay. After hearing the parties' positions, the Court granted a temporary stay of this action as to the Federal Defendants only. ECF No. 126. Therefore, this Order does not address the merits of, or otherwise adjudicate, the Federal Defendants' pending motion to dismiss.

**LEGAL STANDARD**

The Court sets forth the legal standards governing motions to dismiss for lack of standing and failure to state a claim.

**I.      Motion to Dismiss for Lack of Standing**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint . . . the plaintiff has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "Because standing is challenged on the basis of the pleadings, we accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (internal citation and quotation marks omitted). "The task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter*, 822 F.3d at 56 (cleaned up).

II.      **Motion to Dismiss for Failure to State a Claim**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a plausible claim for relief, it must be dismissed. *Id*. at 679.

**DISCUSSION**

Slavitt seeks dismissal of all claims against him, arguing that Berenson lacks standing for failure to allege traceability and redressability, that Berenson fails to adequately state any of his claims, and that Section 230 provides Slavitt immunity from Berenson's Section 1985 and tortious interference claims. The Pfizer Defendants seek total dismissal along similar lines, arguing that Berenson has failed to state a claim under Section 1985 or for tortious interference, and that the First Amendment immunizes them from civil liability.

Because the Court only addresses the pending motions to dismiss from the Non-Stayed Defendants, only the following of Plaintiff's claims are relevant to this Order: (1) Berenson's

First Amendment claim against Slavitt (official capacity); (2) Berenson's asserted violation of Section 1985 against all Non-Stayed Defendants (individual capacity); and (3) Berenson's tortious interference claim against all Non-Stayed Defendants (individual capacity). The Court therefore does not address or adjudicate Plaintiff's First Amendment claim against the Federal Defendants.

The remaining discussion proceeds as follows, taking each of Plaintiff's claims in turn. First, the Court finds that Plaintiff lacks standing to assert a First Amendment claim against Slavitt because he cannot obtain any remedy (injunctive relief or damages under *Bivens*) against Slavitt. Second, the Court finds that Berenson has failed to state a claim under Section 1985 because he has not sufficiently alleged any discriminatory animus against a recognized protected class. Finally, the Court dismisses Berenson's tortious interference with contract claim, finding that New York law applies and that Berenson has not sufficiently alleged facts demonstrating an underlying breach of a contract.

In light of this Order, and because the Federal Defendants' motion to dismiss will not be adjudicated at this time, the Court need not, and therefore declines to address, the following asserted grounds for dismissal raised by the parties: (1) the Court lacks personal jurisdiction over Slavitt; (2) Flaherty, Murthy, and Slavitt are entitled to qualified immunity in their individual capacities for the First Amendment and Section 1985 claims; (3) Section 230 of the Communications Decency Act provides immunity for the tortious interference claim; and (4) the First Amendment immunizes the Pfizer Defendants from civil liability. Also, because the Court finds that Berenson lacks standing to bring his First Amendment claim, the Court does not adjudicate the merits of that claim.

A-513

I.    **Berenson Lacks Standing to Assert a First Amendment Claim Against Slavitt**

Count I of the Complaint and PFAC asserts a violation of the First Amendment against Slavitt and the Federal Defendants. As set forth below, Plaintiff's claim against Slavitt fails because, as a threshold matter, he cannot obtain damages under *Bivens* or equitable relief with respect to Slavitt given his status as a private citizen. Therefore, Plaintiff's First Amendment claim against Slavitt is dismissed with prejudice for lack of standing.

A. **Applicable Law**

The Constitution limits federal courts to hearing certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The Supreme Court has explained that "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal citation and quotation marks omitted). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (internal citation omitted). The plaintiff bears the burden of establishing these elements. *Id*.

Only injury and redressability are at issue in the instant Order with respect to Plaintiff's claim (and requested relief) against Slavitt. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized

26

A-514

and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339 (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted); *see also*

*City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). Regarding imminence, the threatened

injury must be "certainly impending"; allegations of possible future injury are insufficient.

*Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) "Whether

an injury is redressable depends on the relationship between 'the judicial relief requested' and the

'injury' suffered." *California v. Texas*, 593 U.S. 659, 660 (2021) (quoting *Allen v. Wright*, 468

U.S. 737, 753 n.19 (1984)).

### B. Plaintiff Cannot Obtain a Remedy Against Slavitt

Slavitt argues that Plaintiff lacks standing to assert his First Amendment claim against

him because he cannot obtain any of his requested remedies. Slavitt MTD at 19 n.7. For the

reasons set forth below, the Court agrees.

Here, Berenson asks the Court to "[e]njoin [Slavitt] and other persons acting in

coordination or concert with [him] from further violating Mr. Berenson's First Amendment rights

to free speech, right to petition the government, and freedom of the press." PFAC at 93.

Berenson may not obtain equitable relief against Slavitt in his individual capacity because he is

now a private a citizen, and therefore cannot be enjoined from prospective First Amendment

violations even if the Court were to find the existence of a First Amendment violation here. *See*

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019) ("The Free Speech Clause

does not prohibit *private* abridgment of speech."). Furthermore, Plaintiff's requested relief to

stop government officials from violating his First Amendment rights could not be redressed

through any relief against Slavitt, a private citizen. Indeed, despite seeking this relief in the

PFAC, Plaintiff does not appear to dispute his inability to obtain injunctive relief from Slavitt.

Opp. to Slavitt at 13 n.3.

Injunctive relief against Slavitt would also be unavailable to Berenson because he has not plausibly alleged any imminent risk of future violations, by Slavitt, of his First Amendment rights. "An injunction is primarily focused on stopping an unconstitutional violation from occurring on an ongoing basis. It does not seek to punish someone for what they have done and thus, in turn, deter that person from committing similar wrongs in the future." *Cohen v. United States*, 640 F. Supp. 3d 324, 340–41 (S.D.N.Y. 2022). In other words, Plaintiff cannot rely on past injury and instead must plausibly allege an imminent risk of future violations. Plaintiff has only cited a general fear of future violations and retaliation, citing to a denied request for a White House tour (a decision which Slavitt is not alleged to have had any control over). PFAC ¶ 235. And given the 2024 election, the fact that Berenson's allegations focused on the actions of the now-departed Biden Administration only further diminishes the possibility of future harm as described in the PFAC.

Without any legitimate or imminent risk that Slavitt's previous behavior is likely to continue, Plaintiff's demand for injunctive relief fails. *See Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("To obtain forward-looking relief, the plaintiffs must establish a *substantial risk* of future injury that is traceable to the [defendant] and likely to be redressed by an injunction against them.") (emphasis added). Plaintiff's demand for declaratory relief against Slavitt fails for the same reason. *Dorce v. City of New York,* 2 F.4th 82, 95 (2d Cir. 2021) (noting that where plaintiffs seek declaratory relief, they cannot rely on past injury to satisfy the injury requirement for standing).

That leaves only damages. To the extent Plaintiff seeks monetary damages for any claimed violation, Plaintiff would need to bring a *Bivens* action, which is the federal analog of 42 U.S.C. § 1983. *Hartman v. Moore*, 547 U.S. 250, 255 n.2 (2006). While Plaintiff initially

28

conceded he cannot recover under *Bivens*, *see* ECF No. 51 at 34, he now has stated his intent to pursue *Bivens* as a damages remedy. Opp. to Slavitt at 13 n.3; *see also* Opp. to Fed Defs. at 37–39. The Court therefore considers whether a *Bivens* cause of action is available to Plaintiff in this case.

"*Bivens*" refers to an implied right of action for monetary damages against a federal officer or agent, who, while acting in the color of federal authority, violates clearly established laws of the Constitution. *See Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007). In *Bivens*, the Supreme Court found that the petitioner was entitled to redress—specifically, monetary damages—from federal officers for a violation of his Fourth Amendment rights. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971). *Bivens* restricted its holding to only Fourth Amendment violations. But on two subsequent occasions, the Supreme Court extended this implied cause of action for damages against federal officers to cover certain violations of the Fifth Amendment and the Eighth Amendment. *See Davis v. Passman*, 442 U.S. 228, 248–49 (1979) (extending *Bivens* to allow congressional staffer to sue congressman for sex discrimination under the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 23–24 (1980) (extending *Bivens* to Eighth Amendment deliberate indifference claim for failure to provide proper medical attention).

Still, *Bivens* is far from freewheeling. *See Cohen v. United States*, 640 F. Supp. 3d at 336 (summarizing progeny of *Bivens* in which courts reaffirmed its limited scope). Indeed, just a few decades after *Bivens, Passman,* and *Green*, the Supreme Court explicitly noted the need for restraint in further expansions of *Bivens*. In *Ziglar v. Abbasi*, the Supreme Court discussed a framework to be employed where a district court considers an extension of the *Bivens* remedy, further limiting the possibility for expansion. 582 U.S. 120 (2017). Following, *Ziglar,* a Court

must (1) decide whether the claim at issue arises in a "new context"; and (2) ask whether there are "special factors counselling hesitation," meaning a court must inquire "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 136.

Most recently, in *Egbert v. Boule*, the Supreme Court emphasized that *Bivens* faces an extraordinarily high bar before it may be extended to novel areas. 596 U.S. 482, 500–01 (2022). In *Egbert*, the Supreme Court reversed a Fourth Circuit decision that extended *Bivens* to a First Amendment retaliation claim. 596 U.S. at 501–502. In so doing, the Court observed that the *Bivens* inquiry "does not invite federal courts to independently assess the costs and benefits of implying a cause of action." *Id.* at 496. The Supreme Court has also "indicated that if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Id.* at 502. Therefore, district courts only face "one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting 582 U.S. at 136).

Against this backdrop, the Court finds that *Bivens* is not available to Berenson here. The Supreme Court has "never held that *Bivens* extends to First Amendment claims[.]" *Id.* at 498 (quoting *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012)). Moreover, following *Egbert*, the Court can certainly find at least some "reason to think that judicial intrusion into" social media content regulation would be inappropriate. *Id.* at 496 (internal citation and quotation marks omitted). Congress is plausibly better suited to ascertain the appropriate boundaries of the government's involvement in social media and content regulation, and to determine whether to allow a damages action. Because *Egbert*'s characterization and discussion of *Bivens* and its progeny effectively operates "as a bar to a *Bivens* claim in all cases except, perhaps, those

involving Fourth, Fifth, and Eighth Amendment claims factually indistinguishable from *Bivens, Passman, or Carlson*," *Cohen*, 640 F. Supp. 3d at 337, the Court declines to extend *Bivens* to the instant case. *See Ziglar*, 582 U.S. at 136 ("In most instances, the [Supreme] Court's precedents now instruct, the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability.") (internal citations and quotation marks omitted).

None of Plaintiff's arguments to the contrary compel a different result. Plaintiff points out that Slavitt is not a cabinet-level officer and so there is no risk of an impact on systemwide governmental operations. Opp. to Fed Defs. at 38. Plaintiff also notes that the Supreme Court's recent *Murthy* decision heightened the bar for standing, making it even less likely there will be a flood of similar cases. *Id.* Taken together, Plaintiff insists that no "special" factors exist here that prevent an extension of *Bivens* to the instant case.

The Court disagrees. To reiterate, *Egbert* asks the Court to only find "any reason to think that Congress might be better equipped to create a damages remedy" in circumstances like this one. *Egbert*, 596 U.S. at 492. One could easily envision a resulting impact from a ruling that non, high-level cabinet officials, and even temporary ones like Slavitt, could suddenly be liable for damages for certain statements. And such officials could be liable even despite the fact that our jurisprudence recognizes that the Free Speech Clause does not require the government to maintain viewpoint neutrality when speaking about its course of action, and in fact actively tolerates pressure by such officials. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead."); *Walker v. Texas Div.,*

31

*Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[W]hen the government speaks it is entitled to promote a program, to espouse a policy, or to take a position.").

As recognized in *Egbert*, "undoubtedly . . . the prospect of personal liability under the First Amendment would lead to new difficulties and expense." *Egbert*, 596 U.S. at 499 (cleaned up). Congress is better equipped to decide whether providing damages would deter federal employees from carrying out their duties when "faced with the added risk of personal liability for decisions that they believe to be a correct response to improper activity." *Id.* (cleaned up). Indeed, even if the Court were to undertake that task, it could not accurately predict the systemwide consequences of implying a new *Bivens* cause of action here, and "[t]hat uncertainty alone is a special factor that forecloses relief." *Egbert*, 596 U.S. at 493.

Because the incredibly high bar from *Egbert* has not been met, and because there is "at least some" reason to believe Congress is better suited to assess the need for a damages remedy as it relates to the interplay between government speech and social media regulation, the Court declines to extend *Bivens* to the instant case. *See Ziglar*, 582 U.S. at 135 (collecting cases from last thirty years which declined to extend *Bivens*, including a first amendment suit against a federal employer).

A-520

## II.      Berenson Fails to State a Section 1985(3) Claim

The Non-Stayed Defendants also move to dismiss the Section 1985(3) cause of action for failure to state a claim. The Court analyzes the Section 1985(3) claim as against Slavitt in his individual capacity, Gottlieb, and Bourla.[7]

Under Section § 1985(3), "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3). "A conspiracy claim under Section 1985(3) requires a plaintiff to allege: '1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)). The "conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)).

---

[7] For the purposes of this Order, the Court assumes, without deciding, that Section 1985(3) applies to federal officers. *See Iqbal v. Hasty*, 490 F.3d 143, 176–77 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (noting that the "development of case law since *Gregoire* has eroded any basis for interpreting that decision to render section 1985(3) inapplicable to federal officials" and also that there has not been "a definitive ruling from this Court on the application of section 1985(3) to federal officials").

As set forth below, the Court dismisses the Section 1985(3) claim against the Non-Stayed Defendants because Plaintiff has not demonstrated the existence of a recognized protected class, or that the Non-Stayed Defendants acted with any discriminatory animus toward such a class. Accordingly, for the purposes of this Order, the Court does not analyze the conspiracy element or the alleged underlying First Amendment violation by the Federal Defendants and Slavitt.

**A. Berenson Fails to Plausibly Allege the Existence of a Recognized Protected Class**

Berenson has not alleged membership in a class that has been found to be protected under Section 1985(3). Instead, he alleges that in his journalism and reporting, he was "speaking on behalf of an identifiable class of Americans who had chosen not to receive a COVID-19 vaccine," which he alleges includes "a disproportionate number of African-Americans, political conservatives, and evangelical Christians." PFAC ¶ 252. For the reasons explained below, the purported class Berenson identifies is not protected under Section 1985(3).

To state a Section 1985(3) claim, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). In *Griffin*, after finding that Section 1985(3) reaches private conspiracies, the Supreme Court declined to decide whether a conspiracy motivated by invidiously discriminatory intent *other than racial bias* would be actionable under Section 1985(3). *Griffin*, 403 U.S. at 102 n.9. Just over a decade later, turning again to the question of what classes Section 1985(3) covers, the Supreme Court did not determine the full reach of the statute, questioning whether Section 1985(3) extended to classes beyond race and holding only that it was not "intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 837 (1983).

34

Prior to the Supreme Court's decision in *Scott*, the Second Circuit held that Republicans were a protected class under the statute. *See Keating v. Carey*, 706 F.2d 377, 379 (2d Cir. 1983). The Circuit reasoned that understanding the statute as protecting classes based on race was "untenable in light of the history of the Act" and that Congress sought to "prohibit political discrimination in general." *Id*. at 387. In *Gleason v. McBride*, the Second Circuit noted that while *Keating* held political parties to be protected groups under Section 1985(3), the Supreme Court in *Scott* subsequently "suggested that the scope of [S]ection 1985 might not extend to include discrimination against political groups except where that discrimination was based on racial animus." 869 F.2d 688, 695 (2d Cir. 1989). The Second Circuit declined to reconsider its decision in *Keating* as it was not required in *Gleason*: the plaintiff did not claim discrimination based on his political party affiliation. *Id*. Yet in a 2015 case, the Second Circuit reaffirmed its holding in *Keating* that Section 1985(3) covers classes beyond race. *Dolan*, 794 F.3d at 296 (ultimately rejecting that jailhouse lawyers were members of a protected class because they "do not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement.").

Although the Supreme Court and the Second Circuit have not fully defined the contours of protected classes under Section 1985(3), the courts have held that the term "class" as used in the statute "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993); *Dolan*, 794 F.3d at 296. In the context of Section 1985(3), courts in this Circuit have found protected classes to include political affiliation, gender, religion, and disability. *See Keating*, 706 F.2d at 386–87; *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989); *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of*

35

*New York, Inc.*, 968 F.2d 286, 291 (2d Cir. 1992); *Trautz v. Weisman*, 819 F. Supp. 282, 295 (S.D.N.Y. 1993). However, based on subsequent Supreme Court rulings, it is unclear whether discrimination based on political affiliation or gender still qualifies as "class-based discriminatory animus" for the purpose of a conspiracy claim under Section 1985(3). *See Scott*, 463 U.S. at 837; *Bray*, 506 U.S. at 269*; see also Vidurek v. Koskinen*, No. 17-CV-9064, 2018 WL 3597644, at *12 (S.D.N.Y. July 25, 2018), *aff'd*, 789 F. App'x 889 (2d Cir. 2019) (noting that "some district courts in this Circuit have since concluded that political affiliation alone does not constitute a protected 'class' under Section 1985") (cleaned up).

Although classes based on political associations have, in limited situations, satisfied the class-based animus requirement of Section 1985(3), the Court declines to extend the available categories of protected classes to include a person's vaccination status. The alleged class of unvaccinated individuals is little more than a "group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors"; here, that conduct is not getting vaccinated against COVID-19. *See Bray*, 506 U.S. at 269. And like in *Dolan*, the putative class of the unvaccinated "plainly do[es] not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement." 794 F.3d at 296. Courts confronted with constitutional claims that turn, in part, on whether vaccination status is a protected class have likewise concluded that it is not. *See, e.g. Ford v. Northam*, No. 22-CV-00122 (EKD), 2023 WL 2767780, at *9 (W.D. Va. Mar. 31, 2023), *aff'd*, No. 23-6410, 2023 WL 6057493 (4th Cir. Sept. 18, 2023) (internal citation omitted) (in a Section 1985(3) case concluding that "[a] person's vaccination status, which is based on his choice as to whether to accept a vaccine, however 'coerced,' is not a 'discrete, insular, and immutable characteristic comparable to those characterizing classes such as race, national origin, and sex.'"); *Brock v. City of New York*, No.

A-524

21-CV-11094 (AT) (SDA), 2023 WL 5020358, at *5 (S.D.N.Y. Jan. 3, 2023) (finding that unvaccinated plaintiff not part of a legally protected class under the Equal Protection Clause), *report and recommendation adopted*, 2023 WL 11844282 (S.D.N.Y. July 10, 2023), *aff'd*, No. 23-1148, 2024 WL 3493495 (2d Cir. July 22, 2024); *Abadi v. City of New York*, No. 21-CV-8071 (PAE), 2022 WL 347632, at *7–8 (S.D.N.Y. Feb. 4, 2022) (concluding that ordinances that apply to all unvaccinated individuals do not draw a distinction based on a constitutionally protected characteristic); *Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427, 434 (S.D.N.Y. 2021) (concluding that unvaccinated individuals are not a distinctive group identifiable on the basis of some immutable characteristic and there is not a basis similarly in attitudes or ideas or experience that defines and limits the group).

Indeed, this District has recently emphasized the need for an "inherited" or "immutable" characteristic for class-based animus to exist. In *Abadi v. Greyhound Lines, Inc.*, the Plaintiff asserted a Section 1985 claim (among others) based on Greyhound's mask mandate. No. 23-CV-7645, 2024 WL 5155601 (JLR), *1–2 (S.D.N.Y. Dec. 18, 2024). The court granted the defendant's motion to dismiss, reasoning that Section 1985's class analysis requires an "inherited or immutable characteristic[]," and finding that because the mask mandate was enacted at the height of the pandemic, "[t]he impetus for the federal mask mandate and for Greyhound's exemption policy is therefore most fairly construed as public health concerns." *Id.* at *8. The same is true here: at the height of the COVID-19 pandemic, where the Biden Administration described the need for vaccines as a "wartime effort" at a time where "400,000 Americans" had already tragically died, PFAC ¶ 97, the impetus for any focus on Berenson's Twitter activity is "most fairly construed" as arising from public health concerns.

37

Declining to consider the unvaccinated as a protected class follows the reasoning in *Gleason*. The Second Circuit noted that the plaintiff in *Gleason* did not claim discrimination based on his political party affiliation, but instead claimed that he was discriminated against because he was a political opponent of the defendants. 869 F.2d at 695. Drawing a distinction between political party affiliation and political opposition, the Second Circuit confirmed that "those who are in political and philosophical opposition to the defendants, and who are, in addition, outspoken in their criticism of the defendants' political and governmental attitudes and activities do not constitute a cognizable class under section 1985." *Id.* (cleaned up) (internal citation and quotation marks omitted). Here, Berenson has not alleged facts showing anything more than that Berenson was in political and philosophical opposition to the federal government's COVID-19 policies. Thus, Berenson has also not alleged that the Non-Stayed Defendants conspired to deplatform him from Twitter because he is unvaccinated (a fact that he has not plausibly alleged they were even aware of), but rather because of a concern that Berenson was spreading misinformation about COVID-19.

Berenson argues that the Court should follow *Lederman v. Giuliani*, where the Court declined to decide whether the alleged group of street artists, who advocate for greater rights and privileges for street artists under the First Amendment, qualified as a political affiliation for the purposes of satisfying this prong of the Section 1985(3) analysis. No. 98-CV-2024 (LMM) (JCF), 2007 WL 1623103, at *1, 5 (S.D.N.Y. June 5, 2007). Instead, the Court found that there was an issue of material fact as to whether the group was merely a group of individuals who share a desire or whether it was a political group, such that a jury should decide. For the reasons described above, however, the Court finds there is factual issue to whether a group of unvaccinated individuals is a protected class for the purposes of Section 1985(3), and the Court

38

A-526

holds that it is not. *See Martin v. Masters, Mates, & Pilots*, No. 23-CV-04859-RFL, 2025 WL 40285, at *3 (N.D. Cal. Jan. 7, 2025) (collecting cases).

Plaintiff thus cannot demonstrate his membership in a protected class recognized by Section 1985.

### B.  Berenson Fails to Plausibly Allege Discriminatory Animus

Even were the Court to consider Berenson to be a member of a protected class, Berenson has still failed to plead that the alleged conspiracy was undertaken with any class-based discriminatory animus. *See Griffin*, 403 U.S. at 102. Berenson must plead that he was the "victim[] not because of any personal malice the conspirators have toward [him], but because of [his] membership in or affiliation with a particular class." *Gleason*, 869 F.3d at 695 (quoting *Scott*, 462 U.S. at 850 (Blackmun, J., dissenting)).

As noted, Berenson claims that Defendants conspired to deplatform him from Twitter because he was spreading alleged misinformation about COVID-19. But there are "common and respectable reasons" that the Defendants would oppose what they believe to be COVID-19 vaccine misinformation: they believe it imperils public health. *Bray*, 506 U.S. at 270; *see also* PFAC ¶ 229 ("President Biden and his Administration continue to view COVID-19 vaccination as a life-saving measure."). More importantly, even construing the facts in Plaintiff's favor, the PFAC does not allege that Defendants focused on him *because of* his belonging to a group of unvaccinated individuals. *Id.* ¶ 252. Rather, the PFAC alleges that Defendants targeted him for his alleged misinformation about the COVID vaccine. *Id.* ¶ 119, 143–45, 151. And there are no plausible allegations that Defendants' conduct was motivated by Berenson's vaccination status.

Plaintiff also attempts to distinguish *Bray v. Alexandria Women's Health Clinic.* In *Bray,* several abortion clinics sued a group of individuals who organized protests outside of the clinics.

A-527

506 U.S. 263 (1993). These clinics accused the protesters of violating Section 1985(3) by conspiring to deprive women seeking abortions of their right to interstate travel. *Id.* The Supreme Court first rejected the conclusion that "women seeking abortions" could be a qualifying protected class, reasoning that Section 1985 "connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Id.* at 269. The Supreme Court then proceeded to focus on discriminatory purpose, noting that an assertedly benign (though objectively invidious) purpose could also suffice. *Id.* at 270. For example, the "assertedly benign . . . purpose of 'saving' women *because they are women* from a combative, aggressive profession such as the practice of law," could qualify as discriminatory. *Id.*

In reliance on this example from *Bray*, Plaintiff argues that Defendants misconstrue his Section 1985 allegations. Berenson clarifies he does not allege that any Non-Stayed Defendant violated the rights of unvaccinated people by forcing them to receive vaccines. Opp. to Slavitt at 15. Rather, he alleges Defendants aimed to strip unvaccinated people of a fundamental right "which stood and stands outside their membership in that class." *Id.* In other words, Plaintiff appears to assert that Defendants sought to censor Berenson *by reason* of his unvaccinated status, in the same way that it would be unlawful to prevent women, *by reason of their sex*, from participating in something held outside their class (practicing law).

The Court similarly rejects this position. Plaintiff's argument still suffers from a fatal deficiency: in the same way that *Bray* demanded "at least a purpose that focuses upon women *by reason of their sex*," Berenson must allege a discriminatory purpose that focuses upon unvaccinated persons *by reason of their unvaccinated status. Bray*, 506 U.S. at 270. As discussed above, he has not done so: the PFAC does not allege that the Non-Stayed Defendants knew about Plaintiff's vaccination status. Moreover, like in *Bray,* the PFAC does not allege that the Non-

40

A-528

Stayed Defendants "are motivated by a purpose (malevolent or benign) directed specifically at [unvaccinated people] as a class" as opposed to alleged misinformation about the COVID vaccine and motivated by an effort to protect government officials. *Id.*; *see* PFAC ¶¶ 118, 119, 188, 194.

In short, the PFAC only alleges, and raises the inference, that the Non-Stayed Defendants focused on Berenson because of the perceived danger of his spreading misinformation, not that they targeted him or his Twitter activity because of his unvaccinated status. And in any event, as stated previously, a cognizable class cannot "be defined simply as the group of victims of the tortious action." *Id.* (internal citation omitted).

Accordingly, the Court dismisses the 42 U.S.C. § 1985(3) cause of action as to Slavitt in his individual capacity, Gottlieb, and Bourla.

### III.    Plaintiff Fails to Plead a Tortious Interference Claim

Finally, Berenson brings tortious interference with contract claims against Slavitt, Bourla, and Gottlieb. However, Plaintiff does not appear to attempt to explain how Bourla tortiously interfered with any alleged contract, and instead focuses only on Gottlieb and Slavitt. Opp. to Pfizer Defs. at 21–23; Opp. to Slavitt at 16–23. The Court therefore dismisses this claim against Bourla.[8]

As to Gottlieb, Plaintiff argues he "contacted Twitter under false pretenses" to state that Berenson was "inciting physical threats against Dr. Fauci" and that he flagged the tweet that led to Berenson's suspension while "offering no rationale as to why it was false or misleading." Opp. to Pfizer Defs. at 22. As to Slavitt, Plaintiff argues that Slavitt made repeated requested to censor

---

[8] Plaintiff's claim against Bourla would nonetheless fail for the same reasons as discussed *infra*.

Berenson, and did so outside of "normal reporting channels" while failing to offer any rationale as to how Plaintiff violated Twitter policies. Opp. to Slavitt at 19–20.

The PFAC states that New York, California, and Connecticut all recognize claims for tortious or intentional interference with contract. PFAC ¶ 260. Berenson is a resident of New York, Slavitt is a resident of California, and Gottlieb is a resident of Connecticut. *Id.* ¶¶ 258, 259. In general, "[w]hen conduct in one state causes injury in another, the law of the state of conduct governs both issues related to conduct and issues related to persons." Restatement (Third) of Conflict of Laws § 6.09(a). None of the parties have briefed the question of which state's law applies, opting instead to argue Berenson's claims would succeed (or fail) under the laws of any of these states.

Despite the parties' lack of briefing, the Court must still conduct a choice of law analysis. The PFAC asserts that this Court has subject matter jurisdiction over Plaintiff's state law claims because it can exercise supplemental jurisdiction or diversity jurisdiction. PFAC ¶¶ 50–51. In either event, the Court must apply New York's choice of law rules. *See Manning Int'l Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001) ("In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state."); *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("When a federal court sits in diversity, it applies the choice of law rules of the forum state, here New York.").

As set forth below, the Court finds that New York law applies to Plaintiff's claim, and subsequently finds that the tortious interference claim must be dismissed because Plaintiff has not alleged the breach of any contract.

### A. New York Law Applies to Plaintiff's Tortious Interference Claim

Under New York's choice of law principles, the first step "is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). The Court thus examines elements for a tortious interference with contract claim under New York, California, and Connecticut law.

To state a claim for tortious interference with contract under New York law, a plaintiff must allege: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 82 (1996)). "Moreover, 'a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct.'" *Id*. (quoting *Burrowes v. Combs*, 808 N.Y.S.2d. 50, 53 (1st Dep't 2006)).

The elements under California law are similar, though not identical, to New York. Whereas New York requires an underlying breach of contract, California requires a breach *or* a "disruption of the contractual relationship." *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (quoting *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589–90 (Cal. 1990)). Under California law, a plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) *actual breach or disruption of the contractual relationship*; and (5) resulting damage." *Id.* (emphasis added). "Disruption" does not require that there be a breach of contract: it only requires that a defendant's acts disrupt "the benefits due [a plaintiff] under the contract."

43

A-531

*Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1603 (2009); *accord Spotlight Ticket Mgmt. v. Concierge Live, LLC*, No. 24-CV-859 (WLH) (SSC), 2025 WL 235429, at \*6 (C.D. Cal. Jan. 2, 2025).

Connecticut takes a completely different approach: it does not require the plaintiff to demonstrate a breach or alteration of the contractual relationship at all. Under Connecticut law, a plaintiff must allege: "(1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Khan v. Yale Univ.*, 27 F.4th 805, 817 (2d Cir. 2022), *certified question answered*, 295 A.3d 855 (Conn. 2023) (citing *Rioux v. Barry*, 927 A.2d 304, 311–12 (2007)).

A substantive conflict exists between the three states. Whereas a plaintiff under New York law must demonstrate a breach of an underlying contract, in California, a plaintiff need only show a "disruption" of the benefits owed to them under a contract. And in Connecticut, they need not show either. The Court thus proceeds to the next step of New York's choice of law analysis, which is to determine which state has the superior interest in adjudication of Berenson's claim.

In tort cases, New York "applies the law of the state with the most significant interest in the litigation." *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (internal citation omitted). In weighing these interests, "New York distinguishes between conduct-regulating rules and loss-allocating rules." *Id.* "Conduct-regulating laws are those that people use as a guide to govern[] their primary conduct." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (internal citation and quotation marks omitted). "The tort of tortious interference with contractual relations is conduct-regulating because people use it as a guide to

44

govern their conduct with respect to existing contracts." *Tarzy v. Dwyer*, No. 18-CV-1456 (AT), 2020 WL 3318273, at *4 (S.D.N.Y. June 18, 2020) (internal quotation marks and citation omitted). "[W]here negligent conduct occurs in one jurisdiction but the plaintiff's injuries are suffered in another, the situs of the tort is where the last event necessary for liability occurred." *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 605 (S.D.N.Y. 2016) (cleaned up and citation omitted); *see also Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 195 (1985) (similar).

The Court finds that New York has the most significant interest in the litigation of Plaintiff's tortious interference claim. The "last event necessary for liability" occurred when Twitter suspended Berenson's account, and the employee to do so was located in New York at the time. PFAC ¶ 47; *see HV Associates v. PNC Bank, N.A.*, No. 19-CV-7438 (ALC), 2020 WL 5819559, at *6 (S.D.N.Y. Sept. 30, 2020) ("The tort of tortious interference with contract requires that the plaintiff suffer damages, which is the last event that would render a putative tortfeasor liable."). In addition, the PFAC suggests that "the most significant contacts in this case are with New York." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013). Plaintiff is domiciled in this state, and therefore suffered any injury in this state. PFAC ¶ 39. Gottlieb and Bourla both serve as board members of Pfizer, which has its principal place of business in New York. *Id.* ¶ 48. Slavitt worked as the general partner of a private equity fund in New York. *Id.* ¶ 47. The parties also largely cite New York case law in their briefs. *See North Shore Window & Door, Inc. v. Andersen Corp.*, No. 19-CV-6194 (ENV), 2021 WL 4205196, at *10 n.10 (E.D.N.Y. Aug. 3, 2021) ("The parties cite New York law throughout their papers for these claims 'and such implied consent is, of course, sufficient to establish the applicable choice of law.') (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)). And Plaintiff himself appears to concede New York has the strongest ties to this action. Opp. to Slavitt at 23–25.

All told, while the Non-Stayed Defendants are domiciled in different states, they each have significant contacts with New York, and even if discovery revealed that Slavitt and Gottlieb's alleged tortious conduct emanated from different states, what would unite them is the situs of injury: Plaintiff's domicile in New York. The Court now proceeds to analyzing the tortious interference claim under New York law only.

### B. Contracts Between Berenson and Twitter

To support any tortious interference claim, Berenson must allege the existence of a contract between himself and Twitter. Berenson appears to allege just one: Twitter's Terms of Service, which Berenson claims that Twitter modified through the March 2021 five-strike COVID-19 Misleading Information Policy, and the "assurances" he received from Twitter's Vice President of Global Communications, Brandon Borrman. The Court addresses these assertions in turn.

As none of the parties appear to dispute, Twitter's Terms of Service, updated in August 2021 (a few days before Berenson's suspension) created a binding contract between Twitter and Berenson. *See* ECF No. 96-1 (the "Terms of Service"); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (stating that the Court may consider documents incorporated into the complaint by reference in deciding a motion to dismiss). The Terms of Service allowed Twitter to "suspend or terminate" an account for "any or no reason." Terms of Service at 10. It further provided:

> We also retain the right to create limits on use and storage at our **sole discretion** at any time. We may also **remove or refuse to distribute any Content[9] on the Services**, limit distribution or visibility of any Content on the service, suspend or terminate

---

[9] The Terms of Service defined "Content" as "any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services." ECF No. 96-1 at 4. This would uld presumably cover and include a user's tweets.

46

users, and reclaim usernames **without liability to you**. ECF No. 96-1 at 7 (emphases added).

The parties do dispute, however, whether Twitter modified the Terms of Service by "establishing a specific, detailed five-strike policy regarding COVID-19 misinformation" which the company then violated, PFAC ¶ 262, and by making "assurances" through Borrman. To be sure, a court has already accepted this argument from Plaintiff. *See Berenson v. Twitter, Inc.*, No. 21-CV-9818 (WHA), 2022 WL 1289049, at *2 (N.D. Cal. April 29, 2022). There, the court found that Twitter modified its contract with respect to Berenson and that it "breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through its vice president." *Id.*

But that opinion is not binding on this Court, and other courts have reached a different conclusion with respect to how, and whether, Twitter moderation policies modify the terms of service (or function as standalone contracts). *See, e.g.*, *Morton v. Twitter, Inc.*, No. 20-CV-10434 (GW), 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021) (finding that there was nothing to indicate that two of Twitter's content moderation polices were binding contracts, as opposed to aspirational statements). In *Morton*, the court considered whether Twitter breached a contract with the plaintiff by failing to enforce its "Non-consensual nudity policy," in which Twitter promised it "will immediately and permanently suspend any account that [it] identif[ies] as the original poster of intimate media that was created or shared without consent." *Id.* The Court found that the plaintiff had not pleaded a contractual duty because there was nothing to indicate Twitter's content-moderation policies, including the "Non-consensual nudity policy," were "binding, as opposed to merely aspiration statements." *Id.* In reaching that conclusion, the court expressly noted that Twitter's terms of service disclaimed responsibility as to this very content. *Id.*

47

The Court opts to follow the reasoning in *Morton* and other courts. *Id.; cf. Corner Computing Sols. v. Google LLC*, 750 F. Supp. 3d 1208, 1216 (W.D. Wash. 2024) (observing that under both Washington and California law, materials extraneous to a contractual terms of service are not considered part of the contract absent some implicit incorporation). Even construed in Plaintiff's favor, the COVID-19 Misleading Information Policy, like the policy at issue in *Morton*, is aspirational rather than an indication of a fundamental change to Twitter's express notice, in the Terms of Service, that it could suspend or terminate an account for *any or no reason*. *Compare* Terms of Service *with Complaint*, Ex. I, *Genevieve Morton v. Twitter, Inc. et al*, No. 20-CV-10434 (C.D. Cal. Nov. 13, 2020), ECF No. 1. Further, nothing in the COVID-19 Misleading Information Policy references, or otherwise indicates, any intention to modify or alter the Terms of Service. Indeed, the promulgation of policies like the COVID-19 Misleading Information Policy appears to be expressly contemplated by the Terms of Service, which notes:

> We may suspend or terminate your account or cease providing you with all or part of the Services **at any time for any or no reason**, **including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies** or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable.

ECF No. 96-1 at 10 (emphasis added). The Terms of Service hyperlinks "Twitter Rules and Policies," and takes the user to a "Rule and policies" page at Twitter's help center, where a slew of other policies can be found.[10] The COVID-19 Misleading Information Policy was presumably one of those policies. In short, the "Non-consensual nudity policy" at issue in *Morton* contained a similar level of detail as the COVID-19 Misleading Information Policy and made similar representations regarding how Twitter would define and address potential violations. The Court

---

[10] Rules and policies, https://help.x.com/en/rules-and-policies#twitter-rules (last visited July 11, 2025).

therefore reaches the same conclusion as to the COVID-19 Misleading Information Policy given its similarity to the Non-consensual nudity policy.

The Court also notes that Plaintiff does not allege the COVID-19 Misleading Information Policy itself constitutes a contract, but rather a modification to the Terms of Service. PFAC ¶ 262. Accepting Plaintiff's position would therefore still mean that the Terms of Service is the governing agreement between himself and Twitter. And thus, even if the five-strike policy could be seen as a modification of the Terms of Service, it could not be read as a modification to Twitter's unambiguous reservation of the ability to remove content or suspend an account for *any* reason or *no reason at all*.

Fundamentally, read by itself, or in conjunction with the COVID-19 Misleading Information Policy, the Terms of Service authorized Twitter to terminate Berenson's account in any circumstance, and "conduct authorized by a contract cannot give rise to a claim for breach of th[at] agreement." *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 884–85 (N.D. Cal. 2015) (dismissing breach of contract claim where terms of service vested "sole discretion" in YouTube to remove offending content).

The Court next rejects Berenson's contention that the "assurances" he received from Borrman created an enforceable contract or modified the Terms of Service. To reiterate, in May 2020, after Twitter announced it may use labels and warning messages to provide additional explanations or clarifications of certain tweets, Borrman conversed with Plaintiff, informing him that Twitter was "trying to make sure that factual debate finds a way through the emotion." PFAC ¶¶ 78, 81. In December 2020, Twitter promulgated a new COVID-19 misleading information policy to specifically address the COVID-19 vaccines. *Id.* ¶ 86. Borrman told Berenson that the "points you're raising should not be an issue at all" and that the "policy is

49

A-537

designed to allow debate and discussion, but to discourage conspiracy theories, etc." *Id.* ¶ 89. Neither of these statements can be viewed as sufficiently definite promises to form a contract, and in any event, they pre-date the enactment of the March 2021 COVID-19 Misleading Information Policy.

The Court reaches the same conclusion for the March 2021 conversation. After Twitter announced the COVID-19 Misleading Information Policy, Plaintiff again reached out to Borrman. Borrman stated "I will say that your name has never come up in the discussions around these policies" and that: "[i]f it does **I will try** to ensure you're given a heads up before an action is taken, **but I am not always made aware** of them before they're executed. **If something happens, please let me know**." PFAC ¶ 93 (emphasis added). Far from being an unambiguous and enforceable promise, Borrman explicitly couched his statements by acknowledging he would "try" and notify Berenson before action is taken. Borrman's promise to "try" is too vague to create a contract, and in any event cannot be construed as a modification to the Terms of Service or COVID-19 Misleading Information Policy because Borrman's promise only related to trying to *notify* Berenson before an action is taken, not promising *whether* an action would be taken.

Accordingly, the Court analyzes the tortious interference with contract solely with respect to the Terms of Service, and considers whether the PFAC plausibly alleges a breach of the Terms of Service.

### C.  No Breach of Contract

As found above, and as none of the parties dispute, the Terms of Service constitutes a contract between Twitter and Plaintiff, and the PFAC plausibly alleges that Slavitt and Gottlieb knew of that contract. Here, Plaintiff asserts that Twitter violated the Terms of Service by suspending him because Twitter later acknowledged this was a mistake. PFAC ¶ 225. But like

many other courts, this Court too finds that account suspensions by Twitter do not amount to a breach of the Terms of Service, because the Terms of Service allow Twitter to suspend or terminate an account for "any or no reason." *See Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132, 137 (11th Cir. 2020) ("Twitter's Terms of Service, which the plaintiffs do not dispute, allow Twitter to ban [plaintiff] from its platform for any reason at all. So even if [defendant] instructed Twitter to ban her account, it did not tortiously interfere with a business relationship because [plaintiff] did not have legal or contractual rights in the continued use of her account."); *Yuksel v. Twitter, Inc.*, No. 22-CV-5415 (TSH), 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022) (collecting cases and observing that "Twitter had the contractual right under the Terms to suspend [plaintiff's] account, and his breach of contract claim therefore fails."); *cf. also Hall v. YouTube, LLC,* No. 24-CV-04071 (WHO), 2025 WL 1482007, at *5 (N.D. Cal. May 5, 2025) (finding that because YouTube's terms of service "explicitly allow[ed] [it] to remove content and terminate accounts without cause," plaintiff could not plausibly claim Youtube "unfairly deprived him of a promised benefit.").

Even construing Berenson's allegations in the most favorable light, his tortious interference claim would still fail for at least two additional reasons. First, there is no allegation that Slavitt or Gottlieb knew about Borrman's statements, or that they ever interacted with, or even knew, Borrman. The PFAC specifically alleges that Slavitt and Gottlieb consistently reached out to the same point of contact at Twitter (O'Boyle). And given Borrman's own statement that he was not always made aware of actions taken on an individual's account, the PFAC fails to raise a plausible inference that Borrman had any contact with Slavitt or Gottlieb, or any of the individuals allegedly responsible for suspending Berenson's account. Nor does the

PFAC allege any relationship or connection between Borrmann and O'Boyle, Culbertson, or other Twitter executives discussed therein.

Second, and related to the above analysis, even if the Court considered the COVID-19 Misleading Information Policy as a modification to the Terms of Service, Twitter did not violate it by suspending Berenson's account. Although, after the suspension, certain executives at Twitter acknowledged that Berenson's tweets should not have led to his suspension, the COVID-19 Misleading Information Policy expressly urged users to submit an appeal in the event they felt a suspension had occurred in error. ECF No. 96-4 at 4. In other words, the COVID-19 Misleading Information Policy contemplated accidental suspensions, and provided a remedy to such individuals. Berenson has not alleged he was blocked, or estopped, from pursuing any such appeal. Indeed, he does not allege that he sought an appeal at all.

Because the PFAC has failed to allege any breach, the tortious interference with contract claim fails and is dismissed as to Gottlieb and Slavitt. *See Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–127 (2d Cir. 2019) (noting that breach of contract is a required element of tortious interference with contract under New York law); *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 198 N.Y.S.3d 521, 524 (1st Dep't 2023) (affirming dismissal of tortious interference claim where plaintiff failed "to sufficiently plead an underlying breach of contract").

**CONCLUSION**

For the foregoing reasons, the Non-Stayed Defendants' motions to dismiss are GRANTED. The Clerk of Court is directed to terminate ECF Nos. 89 and 94, and to terminate Defendants Andrew M. Slavitt (both in his individual and professional capacity), Albert Bourla, and Scott Gottlieb from this action.

Dated: July 14, 2025
      New York, New York

SO ORDERED.

*Jessica Clarke*

52

JESSICA G. L. CLARKE
United States District Judge

A-540

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

August 1, 2025

**By ECF**
The Honorable Jessica G.L. Clarke
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re:  *Berenson v. Biden, et al.*, No. 23 Civ. 3048 (JGLC)

Dear Judge Clarke:

   This Office represents the Federal Defendants in the above-referenced action.  We write respectfully to provide a further status report pursuant to the Court's Order dated July 21, 2025 (ECF No. 130), and to inform the Court regarding certain developments pertaining to the federal individual capacity defendants and the federal official capacity defendants.

   First, as to the question posed by the Court in its July 21 Order, the Federal Defendants do not intend to seek a continued stay of this action as to them.

   Second, the federal individual capacity defendants[1] respectfully urge the Court to grant their pending motion to dismiss (ECF Nos. 98-99, 110) on the same grounds on which the Court dismissed the claims against the non-stayed, non-federal defendants in its July 14, 2025 Opinion and Order (ECF No. 127, "MTD Order").  With the exception of the tortious interference claim, which is not asserted against any Federal Defendant, all of the reasoning set forth in the MTD Order also applies to the federal individual capacity defendants and supports dismissal of the claims against them.

   Third, the federal official capacity defendants only[2] hereby withdraw their reliance on the arguments set forth in Section III of the Memorandum of Law in Support of the Federal

---

[1] The federal individual capacity defendants are Robert Flaherty, former Director of Digital Strategy at the White House, sued in his individual capacity; and Dr. Vivek Murthy, former Surgeon General of the United States, sued in his individual capacity.  The federal individual capacity defendants do not withdraw any of the arguments made on their behalf in the Federal Defendants' pending motion to dismiss (ECF Nos. 98-99, 110).

[2] The federal official capacity defendants are former President Joseph R. Biden, Jr., sued in his official capacity, replaced pursuant to the operation of Federal Rule of Civil Procedure 25(d) by President Donald J. Trump; Dr. Vivek Murthy, former Surgeon General of the United States, sued in his official capacity, replaced pursuant to the operation of Rule 25(d) by current Deputy U.S. Surgeon General, Rear Admiral Denise Hinton; and the United States of America, replacing former official capacity defendant Robert Flaherty.

A-541

Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 99, "Fed. MTD", at 23-30), which asserts that the First Amended Complaint fails to state a plausible First Amendment claim.  On January 20, 2025, the President issued Executive Order 14,149, titled "Restoring Freedom of Speech and Ending Federal Censorship."  *See Restoring Freedom of Speech and Ending Federal Censorship Executive Order*, 90 Fed. Reg. 8243 (Jan. 28, 2025).  The Executive Order formally announced that "[i]t is the policy of the United States to . . . ensure that no Federal Government officer, employee, or agent engages in or facilitates any conduct that would unconstitutionally abridge the free speech of any American citizen . . . [and] that no taxpayer resources are used to engage in or facilitate any conduct that would unconstitutionally abridge the free speech of any American citizen."  *Id.* §§ 2(b)-(c).  In doing so, the Executive Order denounced "coercive pressure [by the Federal Government] on third parties, such as social media companies, to moderate, deplatform, or otherwise suppress speech."  *Id.* § 1.  In addition, the Executive Order outlined that the Government will "identify and take appropriate action to correct past misconduct by the Federal Government related to censorship of protected speech," *id.* § 2(d), and ordered "[t]he Attorney General, in consultation with the heads of executive departments and agencies, [to] investigate the activities of the Federal Government over the last 4 years" and submit a report with "recommendations for appropriate remedial actions to be taken based on the findings of the report," *id.* § 3(b).  The federal official capacity defendants respectfully request that the Court evaluate their motion to dismiss only on the remaining threshold grounds articulated therein.

   We thank the Court for its consideration of this submission.

         Respectfully,

         JAY CLAYTON
         United States Attorney for the
         Southern District of New York

   By:  */s/ Rebecca S. Tinio*
       REBECCA S. TINIO
       Assistant United States Attorney
       Tel.: (212) 637-2774
       Email:  Rebecca.Tinio@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEX BERENSON,

                Plaintiff,

    -against-

JOSEPH R. BIDEN, JR., et al.,

                Defendants.

23-CV-3048 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Alex Berenson is a journalist who reported on the COVID-19 vaccines during 2020 and 2021 via his Twitter account and personal blog. In doing so, Plaintiff expressed skepticism about, and objections to, the vaccines and governmental mandates during the pandemic. He alleges that because of the critical nature of his work, former President Biden and others in his administration, along with executives at Pfizer Inc. (the makers of one of the mRNA COVID-19 vaccines), worked together to pressure Twitter (now known as "X") to suspend Plaintiff's account. Plaintiff claims this conduct amounted to a censorship conspiracy that violated his First Amendment rights.

All defendants sought to dismiss this action. However, in April 2025, the federal defendants sought a temporary stay in order to assess their position in the wake of the 2024 presidential election, and the issuance of certain executive orders by the current administration. The Court granted the stay as to the federal defendants, but indicated it would render a decision on the motions to dismiss filed by the remaining defendants.

On July 14, 2025, the Court issued an opinion and order granting the motions to dismiss of individual defendants Andrew Slavitt (former White House senior advisor), and Scott Gottlieb and Albert Bourla (both executives at Pfizer, and together with Slavitt, the "Non-Stayed

A-543

Defendants"). The Court dismissed Plaintiff's Section 1985 claim against the Non-Stayed Defendants because Plaintiff failed to plausibly allege discriminatory animus or that he belonged to a cognizable protected class, and dismissed the tortious interference claims because Plaintiff did not allege an underlying breach of Twitter's Terms of Service. The Court also dismissed Plaintiff's First Amendment claim against Slavitt because *Bivens* has never been extended to an action like this one, and the Supreme Court has strongly instructed against further extensions.

The Court, however, expressly reserved decision on the federal defendants' motion to dismiss in light of the temporary stay. Now that the prior stay has been lifted, the federal defendants ask this Court to grant their motion to dismiss based on the Court's recent ruling and the arguments raised in their motion to dismiss.

As set forth below, the federal defendants' motion to dismiss is GRANTED. Consistent with this Court's prior holding, Plaintiff lacks standing to assert a First Amendment claim against both the federal individual and official capacity defendants because he cannot obtain equitable relief or *Bivens* monetary damages. Plaintiff also fails to state a claim under 42 U.S.C. § 1985(3) for similar reasons as those stated in the Court's prior decision in this case: namely, that he has not plausibly alleged the existence of, or his belonging to, a cognizable protected class. Any further amendment would be futile, and therefore Plaintiff is  denied leave to amend.

**BACKGROUND**

I.      **Factual Background**

Given the recency of the Court's order on the Non-Stayed Defendants' motion to dismiss, the Court assumes the parties' familiarity with the underlying facts and allegations. *See Berenson v. Biden*, No. 23-CV-3048 (JGLC) ("*Berenson I*"), 2025 WL 1928094, at *1–12 (S.D.N.Y. July 14, 2025). By way of brief summary, Plaintiff Alex Berenson is an independent journalist and

2

author. ECF No. 80-1 ("PFAC") ¶ 39. He publishes commentary on the websites Twitter and Substack, and wrote a book regarding the public policy response to the COVID-19 pandemic. *Id.* Berenson asserts that former members of the Biden Administration corresponded with employees at Twitter to censor, suspend, or terminate Berenson's account as the result of his reporting on COVID-19 vaccines, tracing, and mask mandates. *See generally Berenson I*, 2025 WL 1928094, at *2–12. Twitter had instituted a five-strike policy rule for tweets that violated its COVID-19 Misinformation Policy. Berenson alleges these officials engaged in a "public pressure campaign" to coerce Twitter into censoring speech that was critical of vaccines by, among other things, having a closed-door meeting with Twitter, corresponding directly with Twitter executives regarding certain of Berenson's tweets, and making public statements about Section 230 of the CDA, which, according to Berenson, could be interpreted as threatening heightened liability for social media companies. *Id.* Berenson also points to certain conversations he had with Twitter executives who gave him "assurances" that his activity generally did not run afoul of their content moderation policies, and alleges that he relied on those assurances in continuing to tweet his reporting. *Id.*

Berenson was suspended after receiving his fifth strike per the Twitter policy; however, Twitter subsequently admitted that he should not have been suspended. *Id.* Berenson subsequently filed this suit, alleging he was harmed because, among other things, the suspension caused him to lose prior posts and tweets, and he lost the ability to communicate with his followers. Berenson also filed a separate lawsuit against Twitter in California federal court. *See Berenson v. Twitter, Inc.*, No. 21-CV-9818 (WHA) (N.D. Cal. Dec. 20, 2021), ECF No. 1.

II.    **Remaining Parties and Claims**

The Court clarifies the remaining parties[1] and claims in this action. Due to the dismissal of the Non-Stayed Defendants, two categories of defendants remain: the federal *official* capacity defendants, and the federal *individual* capacity defendants.

Defendant Joseph R. Biden, Jr., is the former-President of the United States, and has been sued only in his official capacity. PFAC ¶ 40. Former President Biden has automatically been replaced in his official capacity as a defendant in this case with President Donald J. Trump, pursuant to Rule 25 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d); ECF No. 131 n.2.

Defendant Rob Flaherty was the Director of Digital Strategy at the White House. PFAC ¶ 42. Defendant Christian L. Tom then replaced Flaherty in his official capacity as a defendant. ECF No. 30.[2] Defendant Tom is no longer the Director of the White House Office of Digital Strategy and does not appear to have been replaced by any individual in the Trump Administration. Therefore, Flaherty is now sued only in his individual capacity, PFAC ¶ 42, and the United States of America replaces Mr. Flaherty in his official capacity as a defendant. ECF No. 30.

---

[1] Given the change in administration since this action was first filed, Federal Rule of Civil Procedure 25(d) requires substitutions of any Defendant sued in their official capacity. Rule 25 enacts these substitutions automatically. *See* Fed. R. Civ. P. 25(d); *Karcher v. May*, 484 U.S. 72, 83 (1987) (observing that Rule 25 is "designed to prevent suits involving public officers from becoming moot due to personnel changes.").

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Tom was substituted as the successor for Flaherty in his official capacity as Director of Digital Strategy at the White House, because Flaherty no longer holds that position and is no longer employed in any capacity by the United States Government. ECF No. 30 at 1. Accordingly, there is no official capacity claim pending against Flaherty.

4

A-546

Defendant Vivek Murthy, M.D., is the former Surgeon General of the United States. PFAC ¶ 43. He is sued in his individual capacity. *Id*. Denise Hinton, who is the acting deputy U.S. Surgeon General, replaces Murthy in his official capacity as defendant pursuant to FRCP 25.

Therefore, the federal *official* capacity defendants (the "Official Federal Defendants") are: (1) President Donald J. Trump; (2) Deputy U.S. Surgeon General, Rear Admiral Denise Hinton; and (3) the United States of America. The federal *individual* capacity defendants (the "Individual Federal Defendants" and together with the Official Federal Defendants, the "Federal Defendants") are: (1) Robert Flaherty and (2) Dr. Vivek Murthy.

Two of Plaintiff's claims remain against the Federal Defendants: (i) that they conspired to censor his speech in violation of the First Amendment; and (ii) they conspired to take discriminatory action against him based on his belonging to the protected class of unvaccinated person in violation of Section 1985(3).[3]

### III.    Procedural History

The Court similarly assumes the parties' familiarity with the procedural history as set out in *Berenson I*, *see* 2025 WL 1928094 at *11, and therefore provides only a short summary of this case's history. Berenson originally filed this action on April 12, 2023. ECF No. 3 ("Compl."). The original complaint alleges a violation of the First Amendment and the Ku Klux Klan Act, 42 U.S.C. § 1985(3) ("Section 1985"), as well as a claim for tortious interference. Compl. ¶¶ 188–217. The Complaint sought a declaratory judgment that Defendants violated Berenson's First

---

[3] Plaintiff only asserted tortious interference against the Non-Stayed Defendants, and so that claim has been dismissed from this case. *See Berenson I*, 2025 WL 1928094 at *11.

Amendment rights, an injunction preventing further violations, and a variety of damages along with attorneys' fees and costs. *Id.* at 69.

On August 21, 2023, all Defendants moved to dismiss the original complaint. ECF Nos. 38, 40, 44. On March 19, 2024, the Court stayed the entire action due to the pendency of two cases before the Supreme Court: *Murthy v. Missouri*, No. 23-411, and *National Rifle Association v. Vullo*, No. 22-842. ECF No. 71. *Murthy* and *NRA* involved nearly identical issues with respect to Berenson's First Amendment claims, and were therefore highly likely to affect the outcome of the instant case. *Id.*

On September 4, 2024, Plaintiff moved for leave to file an amended complaint. ECF No. 80. The Proposed First Amended Complaint asserts the same causes of action as the original complaint. PFAC ¶¶ 238–267. The Federal Defendants filed a renewed motion to dismiss on October 11, 2024. ECF Nos. 97, 98 ("Fed. Defs. MTD"). Plaintiff filed an opposition on November 15, 2024. ECF Nos. 102 ("Opp. to Fed. Defs."). The Federal Defendants timely filed a reply in further support of the renewed motion. ECF No. 110 ("Fed. Defs. Reply").

On January 20, 2025 (the first day of the new and current administration), President Trump issued Executive Order Number 14,149 titled "Restoring Freedom of Speech and Ending Federal Censorship." *See Restoring Freedom of Speech and Ending Federal Censorship Executive Order*, 90 Fed. Reg. 8243 (Jan. 28, 2025). As a result, on April 16, 2025, the Federal Defendants filed a letter motion requesting a temporary stay of the case for three months to assess their position. ECF No. 122. Plaintiff consented to the requested stay. *Id.* After hearing the parties' positions at an April 23, 2025 conference, the Court granted a temporary stay of this action as to the Federal Defendants only. ECF No. 126. The Federal Defendants have not sought to extend the stay, and now ask this Court to dismiss all claims against them. ECF No. 131.

## DISCUSSION

The Federal Defendants seek dismissal of the First Amendment claim[4] against them for substantially similar reasons as those underlying the *Berenson I* decision: namely, that Plaintiff lacks standing to sustain any such claim. As set forth below, the Court follows the reasoning of *Berenson I* and holds that Plaintiff lacks standing to assert a First Amendment claim against the Federal Defendants. The Court also holds that Plaintiff cannot state a Section 1985 claim against the Federal Defendants because he fails to plausibly allege the existence of, and his belonging to, a protected class recognized under this statute.

In light of this Order and *Berenson I*, the Court need not, and therefore declines to address, the following asserted grounds for dismissal raised by the Federal Defendants: (1) the Individual Federal Defendants are entitled to qualified immunity in their individual capacities for the First Amendment and Section 1985 claims; (2) the separation of powers doctrine would require dismissal against President Trump; and (3) the *Bivens* claim against the Individual Federal Defendants should be dismissed for failure to state a claim.

I.    **Berenson Lacks Standing to Assert a First Amendment Claim Against the Federal Defendants**

Count I of the Complaint and PFAC asserts a violation of the First Amendment against the Federal Defendants. PFAC ¶¶ 238–249. Plaintiff asserts that the Federal Defendants "created an atmosphere of censorship to facilitate [his] suspension from Twitter," and specifically targeted his "constitutionally protected speech." *Id.* ¶¶ 241, 242. The Federal Defendants seek dismissal

---

[4] Due to Executive Order 14,149 (as described above), the Federal Defendants informed the Court they intend to abandon Section III of their memorandum (Fed. Defs. MTD at 23–30) challenging the plausibility of Plaintiff's First Amendment claim on the merits. ECF No. 131 at 1–2. These arguments will thus not be considered and deemed conceded.

A-549

of the First Amendment claim by arguing that Berenson lacks Article III standing. *See* Fed. Defs. MTD. at 11–20.

Our Constitution limits federal courts to hearing only certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. The Supreme Court has explained that "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "If [a] plaintiff[] lack[s] Article III standing, a court has no subject matter jurisdiction to hear their claim." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (internal citation omitted). The plaintiff bears the burden of establishing these elements. *Id.*

The Federal Defendants argue that Plaintiff lacks standing because, among other things, he fails to allege a substantial risk of future injury traceable to them. Fed. Defs. MTD at 16–18. Plaintiff disagrees, pointing to the alleged "White House tour retaliation" and the pre-discovery posture of this case, meaning he need not "literally" demonstrate that the alleged potential future injuries will actually come to pass. Opp. to Fed. Defs. at 28–29. The Court agrees with the Federal Defendants, and following the reasoning in *Berenson I*, finds that Plaintiff lacks standing to assert a First Amendment claim against them.

First, the Individual Federal Defendants (Flaherty and Murthy), are now private citizens. Plaintiff therefore lacks standing to assert a claim against them for the same reasons and rationale the Court identified in dismissing Plaintiff's claim against Slavitt—namely, the fact that the

8

A-550

Court cannot enjoin private citizens from violating another private citizen's constitutional rights, and Plaintiff cannot obtain *Bivens* monetary damages because that cause of action has not been extended to these circumstances (and the Supreme Court has strongly counseled against any such extensions). *Berenson I*, 2025 WL 1928094, at *13–16.

Second, while Official Federal Defendants effectively concede an underlying First Amendment violation (ECF No. 131), Plaintiff lacks standing for declaratory and injunctive relief because he has not plausibly alleged a "substantial risk" of imminent future injury. Where, as here, a plaintiff seeks injunctive or declaratory relief, they "must carry the burden of establishing that [they] sustained or [are] immediately in danger of sustaining some direct injury." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (cleaned up); *see also Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (stating that a plaintiff must demonstrate a "certainly impending" future injury to obtain prospective relief such as declaratory judgment or an injunction). "In doing this, he cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he will be injured in the future." *Id.* (citing *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)) (cleaned up).

Aside from pure speculation about future injury, Plaintiff only points to the former Biden Administration's denial of his request to tour the White House. Opp. to Fed. Defs. at 28–29. But Plaintiff does not plausibly allege, and instead merely assumes, that the Biden Administration denied his tour request because of some lingering grudge regarding his COVID-19 reporting. Even assuming the tour denial was in fact retaliatory, the allegation does not plausibly raise an inference of potential future censorship of Plaintiff's Twitter account, which has since been restored. It therefore cannot be said that Plaintiff has plausibly alleged future or threatened injury that is "certainly impending." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014);

9

*Marcavage*, 689 F.3d 98 at 103 (concluding that plaintiffs lacked standing to pursue equitable claims because they failed to demonstrate "a certainly impending future injury[.]").

Third, as discussed at length in *Berenson I*, the Court declines to extend *Bivens* to the instant case. As explained, there is certainly "at least some 'reason to think that judicial intervention into' social media regulation would be inappropriate," particularly given the Supreme Court's recent recognition of the rights of federal officials to espouse non-neutral viewpoints. *Berenson*, 2025 WL 1928094, at *16 (S.D.N.Y. July 14, 2025) (quoting *Egbert v. Boule*, 596 U.S. 482, 496 (2022)); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead."). The Supreme Court's admonishment against extending *Bivens* applies with equal force here, and the Court sees no reason to reconsider its prior ruling as to the Official Federal Defendants.

Accordingly, Plaintiff cannot assert his First Amendment claim against the Federal Defendants, and it is dismissed with prejudice.

**IV.    Berenson Fails to State a Section 1985(3) Claim Against the Federal Defendants**

The Federal Defendants also move to dismiss the Section 1985(3) cause of action for failure to state a claim. For the same reasons discussed in *Berenson I*, the Court dismisses the Section 1985 claim against the Federal Defendants because Plaintiff has not plausibly alleged the existence of, or his belonging to, a recognized protected class under the statute. *Berenson I*, 2025 WL 1928094, at *17–19. Without Plaintiff's membership in a recognized protected class, the Section 1985 claim fails, and the Court therefore need not specifically address or analyze "discriminatory animus" as to the Federal Defendants (an analysis which would largely follow the rationale in *Berenson I*). *See Alli v. City of New York*, No. 21-CV-4767 (PGG), 2022 WL

10

A-552

4484624, at *2, n.5 (S.D.N.Y. Sept. 27, 2022) (*sua sponte* dismissing Section 1985 claim where plaintiff failed to plead facts demonstrating he was a member of a recognized protected class); *Dolan v. Connolly*, 794 F.3d 290, 296 (2d. Cir. 2015) (affirming dismissal of Section 1985 claim because plaintiff failed to allege membership in a class protected by the statute).

Accordingly, the Court dismisses the 42 U.S.C. § 1985(3) cause of action as to the Federal Defendants in both their individual and official capacities.

## CONCLUSION

For the foregoing reasons, the Federal Defendants' motions to dismiss is GRANTED. The Clerk of Court is directed to terminate ECF Nos. 80, 98, and 115, and to CLOSE this case.

Dated: September 29, 2025
New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

11

A-553

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
ALEX BERENSON,

                       Plaintiff,

        -against-                                    23 **CIVIL** 3048 (JGLC)

                                                         **JUDGMENT**
JOSEPH R. BIDEN, JR., et al.,

                       Defendants.
----------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated September 29, 2025, the Federal Defendants'

motions to dismiss is GRANTED; accordingly, the case is closed.

**Dated:**  New York, New York

        September 30, 2025

                                             **TAMMI M. HELLWIG**
                                       _____
                                            **Clerk of Court**

                     **BY:**            K. mango

                                       _____
                                            **Deputy Clerk**

A-554

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALEX BERENSON,** | |
| **Plaintiff,** | |
| **v.** | Case No.: 1:23-cv-03048-JGLC |
| **JOSEPH R. BIDEN, JR., et al.,** | **NOTICE OF APPEAL** |
| **Defendants.** | |

Notice is hereby given that Alex Berenson appeals to the United States Court of Appeals for the Second Circuit from the judgment entered on September 30, 2025 that closed the case (Dkt. 133). Without limiting this appeal's scope, this appeal encompasses the order entered on September 29, 2025 that dismissed Alex Berenson's claims as against President Donald J. Trump, Deputy U.S. Surgeon General, Rear Admiral Denise Hinton, the United States of America, Robert Flaherty, and Dr. Vivek Murthy (Dkt. 132); the order entered on July 14, 2025 that dismissed Alex Berenson's claims against Andrew M. Slavitt, Albert Bourla, and Scott Gottlieb (Dkt. 127); and all other orders related to the foregoing orders.

Respectfully submitted, this 27th day of October, 2025.

By: */s/ James R. Lawrence, III*
JAMES R. LAWRENCE, III
NC State Bar No. 44,560*
ANTHONY J. BILLER
NC State Bar No. 24,117*
ENVISAGE LAW
2601 Oberlin Rd, Suite
Raleigh, NC 27608
Phone: 919.755.1317
Facsimile: 919.782.0452
Email: jlawrence@envisage.law
        ajbiller@envisage.law

1

A-555

SEAN P. GATES (SBN 186247)*
Illovsky Gates & Calia LLP
155 N. Lake Avenue, Suite 800
Pasadena, CA 91101
Phone: 626.508.1715
E-mail: sean@illovskygates.com

DAVID J. HOFFMAN
Attorney at Law
254 W. 15th Street Apt 2C
New York, New York 10011
Phone: 917.701.3117
E-mail: djhoffman@djhoffmanlaw.com

* admitted pro hac vice

2