# 25-2709

## United States Court of Appeals
### *for the*
## Second Circuit

ALEX BERENSON,

*Plaintiff-Appellant,*

– v. –

DONALD TRUMP, President of the United States, in his official capacity, ROBERT FLAHERTY, Director of Digital Strategy at the White House, in his official capacity, VIVEK H. MURTHY, Surgeon General of the United States, in his official capacity, UNITED STATES OF AMERICA, SCOTT GOTTLIEB, M.D., former FDA Commissioner and member of the Board of Directors of Pfizer, Inc., ALBERT BOURLA, Ph.D., D.V.M. Chief Executive Officer of Pfizer, Inc.,

*Defendants-Appellees,*

ANDREW M. SLAVITT, Senior Advisor to the COVID-19 Response Coordinator, in his official capacity,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES
## DR. BOURLA AND DR. GOTTLIEB

JAMES P. ROUHANDEH
MICHAEL S. SCHEINKMAN
DAVID B. TOSCANO
LUCA MARZORATI
DAVIS POLK & WARDWELL LLP
*Attorneys for Defendants-Appellees*
  *Dr. Bourla and Dr. Gottlieb*
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

CP COUNSEL PRESS   (800) 4-APPEAL • (392998)

# TABLE OF CONTENTS

PAGE

SUMMARY OF THE ARGUMENT ....................................................................1

COUNTERSTATEMENT OF THE ISSUES.......................................................3

COUNTERSTATEMENT OF THE CASE............................................................4

    A.    Dr. Gottlieb and Dr. Bourla..................................................................4

    B.    Twitter's Efforts to Limit Misinformation about COVID-19..............5

    C.    The Alleged Conspiracy and Twitter's Enforcement Actions Against Berenson's Account.................................................................7

        1.    The Issuance of the Five Strikes ...................................................8

        2.    Alleged Communications with Twitter.......................................9

        3.    Remaining Allegations.................................................................10

    D.    Berenson's Prior Lawsuit Against Twitter.........................................11

    E.    District Court Proceedings ..................................................................12

STANDARD OF REVIEW .................................................................................13

ARGUMENT ......................................................................................................14

I.    THE DISTRICT COURT CORRECTLY DISMISSED BERENSON'S SECTION 1985(3) CLAIM..................................................14

    A.    "Unvaccinated Americans" Is Not a Cognizable Class under Section 1985(3) ..................................................................................15

    B.    Berenson Failed to Plead Discriminatory Animus as to Dr. Bourla and Dr. Gottlieb ....................................................................20

    C.    Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb or Dr. Bourla Engaged in Any Conspiracy.........................24

II.    THE DISTRICT COURT CORRECTLY DISMISSED BERENSON'S TORTIOUS INTERFERENCE CLAIM..........................26

i

A. The District Court Correctly Held That Twitter Did Not Breach Any Contract ...................................................................................27

    1. Twitter's Terms of Service Authorized Suspension for "Any or No Reason" ................................................................28

    2. The COVID-19 Misleading Information Policy Did Not Modify the Terms of Service ....................................................29

    3. Borrman's Vague Assurances Did Not Create a Contract or Modify the Terms of Service................................................32

    4. Even if the COVID-19 Policy Modified the Terms of Service, Twitter Did Not Breach It............................................34

B. Dr. Gottlieb's Communications with Twitter Were Not Independently Tortious .........................................................................35

III. THE FIRST AMENDMENT INDEPENDENTLY BARS BERENSON'S CLAIMS ................................................................37

CONCLUSION...................................................................................................42

**TABLE OF AUTHORITIES**

C<small>ASES</small>

P<small>AGE</small>(<small>S</small>)

*Abadi v. City of N.Y.*,
2022 WL 347632 (S.D.N.Y. Feb. 4, 2022) ........................................ 18

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005) ............................................................. 37

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 13

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004) ....................................................... 40

*Behringer v. Cal. Polytechnic State Univ.*,
2023 WL 6811813 (C.D. Cal. Sept. 15, 2023) ................................. 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................... 13

*Bellin v. Zucker*,
6 F.4th 463 (2d Cir. 2021) .................................................................. 4

*Berenson v. Twitter, Inc.*,
2022 WL 1289049 (N.D. Cal. Apr. 29, 2022) ........................... 11, 31

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) .................................................................. *passim*

*Brink v. Bormann*,
2023 WL 6213167 (D.N.J. Sept. 25, 2023) ..................................... 18

*Britt v. Garcia*,
457 F.3d 264 (2d Cir. 2006) ............................................................. 14

*Butler v. Elle*,
281 F.3d 1014 (9th Cir. 2002) ......................................................... 20

*Chandok v. Klessig*,
632 F.3d 803 (2d Cir. 2011) ................................................................ 41

*Commil USA, LLC v. Cisco Sys.*,
575 U.S. 632 (2015) ............................................................................ 31

*Conte v. Emmons*,
895 F.3d 168 (2d Cir. 2018) ................................................................ 36

*Daniels v. Alphabet Inc.*,
2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ............................... 30, 31

*Desny v. Wilder*,
46 Cal. 2d 715 (1956) ........................................................................ 32

*Dolan v. Connolly*,
794 F.3d 290 (2d Cir. 2015) ....................................... 1, 14, 16, 17

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013) ......................................................... 40, 42

*Fabrikant v. French*,
691 F.3d 193 (2d Cir. 2012) ................................................................ 26

*Flamm v. Am. Ass'n of Univ. Women*,
201 F.3d 144 (2d Cir. 2000) ................................................................ 41

*Ford v. Northam*,
2023 WL 2767780 (W.D. Va. Mar. 31, 2023),
*aff'd*, 2023 WL 6057493 (4th Cir. Sept. 18, 2023) ........................... 17

*Gallop v. Cheney*,
642 F.3d 364 (2d Cir. 2011) ................................................................ 25

*Gleason v. McBride*,
869 F.2d 688 (2d Cir. 1989) ..................................................... 16, 21, 23

*Griffin v. Breckenridge*,
403 U.S. 88 (1971) ............................................................................. 15

*Hammerhead Enters. v. Brezenoff*,
707 F.2d 33 (2d Cir. 1983) ............................................................ 39, 42

*Hustler Mag. v. Falwell*,
485 U.S. 46 (1988) ............................................................................. 41

iv

*Illoominate Media, Inc. v. Cair Fla., Inc.*,
841 F. App'x 132 (11th Cir. 2020) ........................................................ 28, 36, 37

*Illoominate Media, Inc. v. Cair Found.*,
2019 WL 13168767 (S.D. Fla. Nov. 19, 2019) ................................................. 36

*In Touch Concepts, Inc. v. Cellco P'ship*,
788 F.3d 98 (2d Cir. 2015) .............................................................................. 29

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*,
968 F.2d 286 (2d Cir. 1992) ...................................................................... 16, 17

*Keating v. Carey*,
706 F.2d 377 (2d Cir. 1983) ........................................................................... 16

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (1996) ..................................................................................... 35

*Lederman v. Giuliani*,
2007 WL 1623103 (S.D.N.Y. June 4, 2007) .................................................. 19

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ....................................................................................... 24

*Martin v. Masters, Mates, & Pilots*,
761 F. Supp. 3d 1236 (N.D. Cal. 2025) .......................................................... 17

*Martin v. Tumblr, Inc.*,
2017 WL 11665339 (S.D.N.Y. Feb. 10, 2017) ............................................... 29

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) ....................................................................................... 41

*McLellan v. Miss. Power & Light Co.*,
545 F.2d 919 (5th Cir. 1977) .......................................................................... 20

*Moriarty v. Port of Seattle*,
2024 WL 4290279 (W.D. Wash. Sept. 25, 2024) ..................................... 17, 18

*Morton v. Twitter, Inc.*,
2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ................................................ 30

*Murphy v. Twitter, Inc.*,
60 Cal. App. 5th 12 (2021) ............................................................................. 31

v

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................ 12, 26, 35

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .................................................................... 40

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024) .................................................................... 12

*O'Handley v. Padilla*,
579 F. Supp. 3d 1163 (N.D. Cal. 2022),
*aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ............... 26

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003) ........................................................... 40

*Rich v. Fox News Network, LLC*,
939 F.3d 112 (2d Cir. 2019) ........................................................... 27

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................ 38, 40

*Song fi Inc. v. Google, Inc.*,
108 F. Supp. 3d 876 (N.D. Cal. 2015) ................................................. 29

*Starzynski v. Capital Pub. Radio*,
88 Cal. App. 4th 33 (2001) ............................................................ 33

*Sweet v. Google Inc.*,
2018 WL 1184777 (N.D. Cal. Mar. 7, 2018) ............................................. 31

*Taboola, Inc. v. Ezoic Inc.*,
2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) ............................................. 34

*Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
843 F.3d 561 (2d Cir. 2016) ........................................................... 13

*United Bhd. of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*,
463 U.S. 825 (1983) ................................................................... 16

*We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*,
76 F.4th 130 (2d Cir. 2023) ........................................................... 18

*Webb v. Goord*,
340 F.3d 105 (2d Cir. 2003) ....................................................... 24, 26

*Yuksel v. Twitter, Inc.*,
2022 WL 16748612 (N.D. Cal. Nov. 7, 2022) ................................................... 28

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ................................................................................ 24

*Zilg v. Prentice-Hall, Inc.*,
717 F.2d 671 (2d Cir. 1983) ................................................... 36, 37, 40

<u>STATUTES & RULES</u>

42 U.S.C. § 1985 ............................................................................... *passim*
Fed. R. Civ. P. 12 ................................................................................ 13
Fed. R. Civ. P. 12(b)(6) ................................................................................ 11

## SUMMARY OF THE ARGUMENT

Appellant Alex Berenson brought this action alleging a vast conspiracy, hatched at the White House by the President of the United States and members of his administration, to target his Twitter account for removal based on his criticism of the government's COVID-19 policy. As the district court recognized, Berenson attempted to glom onto this alleged conspiracy two private citizens—Dr. Scott Gottlieb, a former FDA Commissioner and independent director of Pfizer Inc. ("Pfizer"), and Dr. Albert Bourla, Pfizer's CEO—claiming they violated his alleged rights under 42 U.S.C. § 1985(3) and tortiously interfered with his contractual relationship with Twitter under state law. The district court correctly dismissed both of Berenson's claims against Dr. Gottlieb and Dr. Bourla, applying settled Second Circuit law to the amended complaint's allegations. Its analysis was thorough, and its conclusions were sound—and they are consistent with every court to have addressed these issues. Berenson's meritless appeal points to no error below and explicitly asks this Court to depart from its own settled precedent.

*First*, Berenson's Section 1985(3) claim fails because "unvaccinated Americans" is not a cognizable class under the statute. Under this Court's precedent, Section 1985(3) reaches only classes defined by "inherited or immutable characteristics." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). Vaccination status is the opposite of immutable: it is a voluntary choice, and every vaccinated American

1

was once unvaccinated. As a result, every American would therefore fall into such a supposed class at one time. This Court has rejected the argument that vaccination status is a constitutionally relevant characteristic. And every other court to consider the question has held that unvaccinated people are not a cognizable Section 1985(3) class.

The district court also correctly held that Berenson failed to plead class-based discriminatory animus: his own allegations establish that defendants were motivated by concern that his reporting was "leading to preventable deaths," not by animus toward unvaccinated Americans as a supposed class. SPA-39–41; A-344 (FAC ¶ 253).

*Second*, the district court correctly dismissed Berenson's tortious interference claim because he did not (and, indeed, cannot) plead a breach of his contract with Twitter. Berenson concedes that Twitter's Terms of Service authorized suspension for "any or no reason." Neither a discretionary content-moderation policy nor a Twitter executive's vague promise to "try" to provide Berenson advance notice before any action modified that authorization. The district court's holding follows directly from the Terms of Service and is consistent with the weight of authority holding that platform policies do not override permissive terms of service.

*Third*, the First Amendment rights *of Dr. Gottlieb* independently bar Berenson's claims. Dr. Gottlieb's alleged communications with Twitter were noncoercive

expressions of opinion on matters of public concern—the same views he had advocated publicly for years in newspaper columns, on television, and in a published book. The Supreme Court and this Court have held that the First Amendment serves as a defense in tort suits and civil-rights actions alike, and that noncoercive speech urging a publisher or platform to reconsider what it distributes is protected regardless of the plaintiff's theory of liability.

The district court's judgment was correct and should be affirmed.

**COUNTERSTATEMENT OF THE ISSUES**

1.     Section 1985(3) requires a conspiracy motivated by animus toward a class defined by "inherited or immutable characteristics." Berenson's proposed class—"unvaccinated Americans"—is defined solely by a shared decision not to receive a medical product, and he alleged that the defendants were motivated by a concern that his reporting was "leading to preventable deaths." Did the district court correctly dismiss Berenson's Section 1985(3) claim?

2.     Twitter's Terms of Service permitted it to suspend any account for "any or no reason." During the COVID-19 pandemic, Twitter created a misinformation policy that gave the company discretion over what content to remove and how to respond to violations, and a Twitter executive separately promised to "try" to give Berenson notice before any enforcement action was taken. Did the district court

3

correctly dismiss Berenson's tortious interference claim for failure to plead a breach of contract?

3.    Dr. Gottlieb is a physician and former FDA Commissioner who spent years as a prominent public voice on COVID-19—in newspaper columns, on national television, and in a published book.  His alleged communications with Twitter addressed the same topics he had discussed publicly for years.  Does the First Amendment permit the imposition of tort or civil-rights liability on a private citizen for noncoercive speech on matters of public concern?

<strong>COUNTERSTATEMENT OF THE CASE</strong>[1]

**A.    Dr. Gottlieb and Dr. Bourla**

Dr. Scott Gottlieb is a physician, author, and media commentator who served as Commissioner of the Food and Drug Administration from 2017 to 2019.  A-261, A-310 (FAC ¶¶ 18, 44, 158).  After leaving government service, Dr. Gottlieb joined a policy institute as a senior fellow, became a partner at a venture capital firm, and took positions on the boards of several public companies, including an independent directorship on the board of Pfizer.  A-311 (FAC ¶¶ 158–60).  Dr. Gottlieb has long been one of the nation's most prominent public voices in the debate over COVID-

---

[1]    These facts are drawn from the amended complaint because well-pleaded facts are accepted as true solely for the purposes of this appeal.  *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2001).

19 policy. A-311 (FAC ¶¶ 160). He wrote a book identifying gaps in the global response to COVID-19, appeared regularly on CNBC and CBS News and other cable and political talk programs, and contributed commentary to *USA Today*. A-268, A-311–12 (FAC ¶¶ 44, 160, 164).

Dr. Gottlieb's public advocacy on these issues predated the events of this lawsuit by years. In April 2020, nearly a year before the alleged conspiracy took shape, Dr. Gottlieb joined 15 current and former public health officials in a bipartisan letter to Congress calling for investment in COVID-19 tracking and tracing. A-311–12 (FAC ¶ 161). He continued to advocate publicly on vaccination and public health through 2021, including for expanded vaccine distribution and access. A-312 (FAC ¶ 164). His views on those issues—expressed in columns, on television, and in public statements—did not change when he communicated with Twitter about COVID-19 misinformation.

Dr. Albert Bourla has served as Pfizer's chief executive officer since 2019. A-32 (Compl. ¶ 34). Under his leadership, Pfizer co-developed the first FDA-approved COVID-19 vaccine. A-312, A-317–18 (FAC ¶¶ 163, 175, 179).

**B.    Twitter's Efforts to Limit Misinformation about COVID-19**

Twitter (since renamed X) was a social media platform on which users posted short messages called "tweets." A-271 (FAC ¶ 57). Every Twitter user was bound by the platform's Terms of Service, which Twitter offered as a "binding contract."

5

A-345 (FAC ¶ 262); A-444–54 (Terms of Service). Twitter's Terms of Service expressly reserved the company's right to "suspend or terminate your account . . . at any time for any or no reason." A-452. The Terms also contemplated the existence of separate "Twitter Rules and Policies" that Twitter could promulgate and apply at its discretion. A-452.

Twitter implemented several content-moderation policies addressing COVID-19 over the course of the pandemic. A-278 (FAC ¶¶ 76–77). In late 2020, Twitter published a COVID-19 Misleading Information Policy (the "Policy") barring content that advanced a "claim of fact" that was "demonstrably false or misleading" and "likely to impact public safety." A-281 (FAC ¶ 86); A-484–87 (Policy). In March 2021, Twitter updated the Policy to establish a five-strike framework, under which repeated violations would result in escalating consequences and, upon a fifth strike, permanent suspension. A-282 (FAC ¶ 91); A-486.

The Policy gave Twitter broad discretion at every stage. The section identifying content "not [in] violation" of the Policy provided only that certain categories of speech—including "strong commentary" and "public debate about the advancement of COVID-19 science"—were "generally not in violation" of the Policy, and only "[i]n the absence of other policy violations." A-485. The enforcement provisions similarly preserved Twitter's discretion: the Policy stated that the actions Twitter "may take may include" tweet deletion, labeling, account locks, and permanent

6

suspension, and separately reserved the right to suspend accounts outside the strike framework entirely if Twitter "determine[d]" that an account was "dedicated to" promoting misleading narratives. A-486–87. The Policy did not reference the Terms of Service, purport to modify them, or disclaim Twitter's reservation of the right to suspend accounts for any reason.

Twitter actively solicited user reports of potentially violating content, and its moderation decisions were made by internal teams of employees who reviewed individual accounts and tweets. A-277, A-283, A-329 (FAC ¶¶ 74, 94, 203–04).

### C. The Alleged Conspiracy and Twitter's Enforcement Actions Against Berenson's Account

Throughout the COVID-19 pandemic, Twitter independently reviewed Berenson's account, and applied its COVID-19 policies to Berenson through its own internal processes. In March 2020, the Imperial College London asked Twitter to "delete Berenson's tweets or at least flag them for making false claims." A-276–77 (FAC ¶¶ 73–74). Twitter reviewed the tweets and declined to take action. A-278 (FAC ¶ 75). In March 2021, a journalist reported Berenson's account, and Twitter conducted what it internally described as a "deep dive" into his content. A-283–84 (FAC ¶¶ 94–95). Twitter's Global Escalation Team reviewed Berenson's account and concluded that although he "leverage[d] individual data points from a combination of various sources," he "avoid[ed] making demonstrably false or misleading

claims about COVID-19 vaccines." A-283–84 (FAC ¶ 94). Twitter declined to take action on Berenson's account at that time. *Id.*

On April 21, 2021, Biden Administration officials met with Twitter employees. A-293 (FAC ¶ 115). At the meeting, White House officials asked why Twitter had not suspended Berenson's account. A-293–94 (FAC ¶¶ 115–17). One of Twitter's own employees responded, in an internal Slack message, "I've taken a pretty close look at his account and I don't think any of it's violative." A-296 (FAC ¶ 122). Weeks later, Twitter called White House staff to confirm that Berenson would not be removed because he had not violated Twitter's policies. A-297 (FAC ¶ 123).

### 1. *The Issuance of the Five Strikes*

- Twitter issued Berenson's first strike under the COVID-19 Policy in March 2021 (the same month it adopted the new policy), based on a tweet that mRNA vaccines are "more properly described as a gene therapy than a vaccine." A-284 (FAC ¶ 95).

- Twitter issued the second strike on July 16, 2021, based on a tweet stating that "[t]he vaccines are failing." A-307, A-313 (FAC ¶¶ 149, 165).

- Twitter issued the third strike on July 27, 2021. A-317 (FAC ¶ 174). The amended complaint does not allege that either Dr. Gottlieb or Dr. Bourla communicated with Twitter about Berenson's account before any of these three strikes were issued.

- Twitter issued the fourth strike on July 30, 2021, based on a tweet saying that the Pfizer COVID-19 vaccine "shows it does nothing to reduce the overall risk of death. ZERO." A-319 (FAC ¶¶ 180–81).

- Twitter issued Berenson his fifth strike, and suspended his account, on August 28, 2021, after Berenson tweeted: "It doesn't stop infection. Or transmission. Don't think of it as a vaccine. Think of it—at best—as a therapeutic with a

limited window of efficacy and terrible side effect profile that must be dosed IN ADVANCE OF ILLNESS. And we want to mandate it? Insanity." A-327 (FAC ¶ 200); A-329–30 (FAC ¶¶ 204–05).

### 2. *Alleged Communications with Twitter*

- On July 18, 2021, Slavitt—who by then had officially left the White House, A-309 (FAC ¶ 156)—introduced Dr. Gottlieb by email to Todd O'Boyle, a public policy executive at Twitter. A-313 (FAC ¶ 166). On July 19, Dr. Gottlieb emailed O'Boyle expressing concern about unspecified verified Twitter accounts that "are fueling dangerous and false narratives on key public health issues related to the pandemic" and "negatively impacting public health and harming patients." A-313–14 (FAC ¶ 167). The email did not mention Berenson.

- On July 23, 2021, Dr. Gottlieb contacted O'Boyle again to gain Twitter's views before "discussing some of [his] perspectives . . . on TV this weekend." A-316 (FAC ¶ 172).

- On August 1, 2021, Dr. Gottlieb forwarded Berenson's tweet referencing Auschwitz concentration camp gates, along with public criticism of that tweet by the Auschwitz Memorial, to O'Boyle. A-322–23 (FAC ¶¶ 189–90).

- On August 24, 2021, Dr. Gottlieb emailed O'Boyle forwarding a link to a Berenson *Substack* post criticizing Dr. Anthony Fauci, with the cover message: "This is what[']s promoted on Twitter. This is why Tony [Fauci] needs a security detail." A-324–25 (FAC ¶¶ 194–95). Dr. Gottlieb did not mention the possibility of adverse action against Berenson's account. O'Boyle arranged a call between Dr. Gottlieb and Twitter staff to discuss the matter. A-325–26 (FAC ¶¶ 196–97).

- On August 28, 2021, Dr. Gottlieb forwarded Berenson's "Don't think of it as a vaccine" tweet to O'Boyle without comment. A-327 (FAC ¶ 200). O'Boyle sent the tweet to the Twitter team responsible for review. A-329 (FAC ¶ 203). A separate Twitter team later labeled the tweet as misleading, issued Berenson his fifth strike, and suspended his account. A-329–30 (FAC ¶¶ 204–05).

9

Twitter's senior leadership moved immediately to reverse the suspension. The amended complaint alleges that Twitter's chief executive Jack Dorsey questioned whether the second strike was properly issued, A-320 (FAC ¶ 183), and that Dorsey and general counsel Vijaya Gadde were not aware that Berenson had been banned when the suspension became public after the fifth strike. A-330–31 (FAC ¶¶ 208–09). The morning after the fifth strike, Gadde told a senior manager that Berenson should not have been banned and that Dorsey did not believe the correct decision had been made. A-331 (FAC ¶ 210). The senior manager agreed and stated that Twitter would "rescind the strike and restore [Berenson's] account if he appealed." *Id.* But Berenson did not exercise his right of appeal under Twitter's Terms of Service.

### 3. *Remaining Allegations*

The amended complaint contains no allegation that Dr. Bourla ever communicated with Twitter about Berenson—or any other topic. The conspiracy theory against Dr. Bourla rests entirely on three allegations: that Dr. Bourla appeared alongside President Biden at a public event on February 19, 2021, A-285 (FAC ¶ 98); that Dr. Bourla attended a July 28, 2021 White House meeting with unspecified attendees, A-318 (FAC ¶ 178); and that Dr. Bourla is the chief executive officer of Pfizer, on whose board Dr. Gottlieb sits, A-310–11 (FAC ¶¶ 158–59).

10

Berenson does not allege that Dr. Gottlieb or Dr. Bourla ever discussed Berenson's Twitter account with any government official. The complaint alleges that Slavitt left the White House in June 2021, A-303 (FAC ¶ 139), and that Slavitt was in "pretty regular" contact with Dr. Gottlieb during "the winter and spring of 2021." A-312 (FAC ¶ 162). But Berenson does not plead facts showing that any of those conversations concerned him. *See id.* And every communication between Dr. Gottlieb and Slavitt that Berenson relies on post-dates Slavitt's departure from government. *See id*.

### D. Berenson's Prior Lawsuit Against Twitter

Berenson sued Twitter in December 2021 in the Northern District of California, bringing First Amendment and contract claims. A-337 (FAC ¶ 225); *see Berenson v. Twitter, Inc.*, 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022). On Twitter's Rule 12(b)(6) motion, the court rejected Berenson's First Amendment claim, holding that Twitter's suspension was not "state action" and that "general cajoling from various federal officials regarding misinformation on social media platforms do[es] not plausibly assert Twitter conspired or was otherwise a willful participant in government action." *Id.* at *3. The court held that Berenson had stated claims only for breach of contract and promissory estoppel, relying on alleged private assurances to Berenson by Twitter's vice president of global communications, Brandon Borrman. *Id*. at *1–2. On June 30, 2022, the parties settled. Twitter reinstated Berenson's

11

account and publicly stated: "Upon further review, Twitter acknowledges Mr. Berenson's Tweets should not have led [to] his [account's] suspension at that time." A-337 (FAC ¶ 225).

### E.     District Court Proceedings

Berenson filed this action on April 14, 2023.  A-23–92 (Compl.).  Defendants moved to dismiss the original complaint.  While the motions were pending, the district court stayed the case pending the Supreme Court's decisions in *Murthy v. Missouri*, 603 U.S. 43 (2024), and *National Rifle Association v. Vullo*, 602 U.S. 175 (2024).  SPA-21.  After the Supreme Court decided both cases, the district court set oral argument for September 12, 2024.  SPA-22.  Shortly before argument, Berenson moved to file an amended complaint, which the district court construed as mooting the pending motions to dismiss.  SPA-22.

Defendants filed renewed motions to dismiss on October 11, 2024.  SPA-22. On July 14, 2025, the district court granted Dr. Gottlieb and Dr. Bourla's motion in full.  SPA-1–52.  The district court held that Berenson failed to plead a cognizable class under Section 1985(3), SPA-34–39; failed to plead class-based discriminatory animus, SPA-39–41; and failed to plead tortious interference claims because he did not allege a breach of his contract with Twitter, SPA-50–52.  The district court also dismissed the tortious interference claim against Dr. Bourla because Berenson "d[id] not appear to attempt to explain how Bourla tortiously interfered with any alleged

12

contract." SPA-41. In a separate order, the district court dismissed all remaining claims against the federal government defendants. SPA-53–63. Berenson appealed the dismissal of his claims against Dr. Gottlieb and Dr. Bourla. A-23–92.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's dismissal of a complaint under Rule 12 of the Federal Rules of Civil Procedure. While this Court must accept all well-pleaded facts and draw all reasonable inferences in favor of the non-moving party, *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), to withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Where, as here, a plaintiff pleads a conspiracy, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

---

[2] Unless otherwise indicated, all internal quotation marks, citations, and alterations are omitted from quotations.

13

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY DISMISSED BERENSON'S SECTION 1985(3) CLAIM

Section 1985(3) provides a remedy for private conspiracies "for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). "A conspiracy claim under Section 1985(3) requires a plaintiff to allege: '1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Dolan*, 794 F.3d at 296 (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)).

The district court properly dismissed Berenson's Section 1985(3) claim on two independent grounds: that Berenson failed to plead a cognizable class, SPA-34–39, and that Berenson failed to plead class-based discriminatory animus, SPA-39–41. Either ground independently supports affirmance. And the dismissal can also be affirmed on the alternative ground that Berenson fails to plead an actionable conspiracy involving Dr. Gottlieb or Dr. Bourla.

14

### A. "Unvaccinated Americans" Is Not a Cognizable Class under Section 1985(3)

The district court correctly held that "unvaccinated individuals" is not a cognizable class under Section 1985(3). SPA-36. The purported class here amounts to "little more than a 'group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors'—here, that conduct is not getting vaccinated against COVID-19." SPA-36 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993)). Binding Supreme Court and Second Circuit precedent compels the conclusion that vaccination status is not a constitutionally protected characteristic. Not surprisingly, every court to address the question has held that unvaccinated individuals are not a cognizable class under Section 1985(3).

The Supreme Court has been clear: to avoid Section 1985(3) becoming a "general federal tort law," a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). In the years since, the Supreme Court has consistently cautioned against extending the statute. In *Griffin*, the Court expressly declined to decide whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable. *Id.* at 102 n.9. In *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, the Supreme Court again declined to extend Section 1985(3) beyond race-based classes. The Court rejected an alleged class of non-union workers, holding that the statute

15

does not reach "conspiracies motivated by bias towards others on account of their *economic* views, status, or activities." 463 U.S. 825, 836–37 (1983). And in *Bray*, the Supreme Court rejected a class of "women seeking abortion," holding that "class" under Section 1985(3) "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." 506 U.S. at 269. The Court declined to convert the statute into a "general federal tort law" that the class-based requirement was designed to prevent. *Id.*

Consistent with this precedent, this Court has held that the statute reaches only classes defined by "inherited or immutable characteristics." Most recently,[3] in *Dolan*, this Court recognized that "Section 1985(3) covers classes beyond race"—such as gender and political affiliation. 794 F.3d at 296; *see also Jews for Jesus, Inc. v.*

---

[3] In *Keating v. Carey*—decided before *Scott* and *Bray*—this Court extended Section 1985(3) to a class consisting of Republicans, reasoning that the statute was enacted in response to Klan violence directed at both Black Americans and their Republican allies. 706 F.2d 377, 386–88 (2d Cir. 1983). In light of *Scott*, this Court in *Gleason v. McBride* cabined *Keating* to "political party affiliation," and refused to extend Section 1985(3) to "a political opponent of the defendants" who "was extremely vocal in his opposition." 869 F.2d 688, 695 (2d Cir. 1989). This Court ruled that "those who are in political and philosophical opposition to the defendants, and who are, in addition, outspoken in their criticism of the defendants' political and governmental attitudes and activities do not constitute a cognizable class under section 1985." *Id*.

*Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992) (religion). But the *Dolan* court limited the scope of the statute to classes with "inherited or immutable characteristics." 794 F.3d at 296 (holding that "jailhouse lawyers and members of an [inmate liaison committee]" were not a cognizable class). In sum, the classes this Court has recognized beyond race reflect deep, identity-based affiliations with communities and belief systems that the law has long treated as cognizable and constitutionally protected.

As every court to answer the question has held, vaccination status is categorically different. It is defined by a single decision about a specific medical product, not by affiliation with any identity-based community or belief system. As the district court correctly observed, "[a] person's vaccination status, which is based on his choice as to whether to accept a vaccine, however 'coerced,' is not a 'discrete, insular, and immutable characteristic.'" SPA-36 (quoting *Ford v. Northam*, 2023 WL 2767780, at *9 (W.D. Va. Mar. 31, 2023), *aff'd*, 2023 WL 6057493 (4th Cir. Sept. 18, 2023)). On the contrary, every person who is now vaccinated was once unvaccinated—the opposite of an "inherited or immutable" characteristic.

Courts across multiple circuits have uniformly rejected vaccination status and related COVID-19 groupings as cognizable Section 1985(3) classes. *Martin v. Masters, Mates, & Pilots*, 761 F. Supp. 3d 1236, 1241 (N.D. Cal. 2025) ("unvaccinated people are not a protected class under § 1985(3)"); *Moriarty v. Port of Seattle*, 2024

17

WL 4290279, at *14 (W.D. Wash. Sept. 25, 2024) (rejecting class based on vaccination and masking); *Behringer v. Cal. Polytechnic State Univ.*, 2023 WL 6811813, at *6 (C.D. Cal. Sept. 15, 2023) (rejecting class of those "opposed to . . . Covid-19 public health measures"); *Brink v. Bormann*, 2023 WL 6213167, at *6–7 (D.N.J. Sept. 25, 2023) (rejecting class based on "anti-vaccination" views); *Ford*, 2023 WL 2767780, at *9 (rejecting "vaccination status" as a Section 1985(3) class).

These cases are entirely consistent with this Court's rejection of vaccination status as a protected characteristic in other constitutional contexts. *We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 156 (2d Cir. 2023); *see also Abadi v. City of N.Y.*, 2022 WL 347632, at *8 (S.D.N.Y. Feb. 4, 2022) ("[T]he distinction . . . between vaccinated and non-vaccinated persons has an amply rational basis."). If vaccination status does not warrant heightened scrutiny under the Equal Protection Clause, then unvaccinated Americans cannot constitute a protected class under Section 1985(3)—a statute whose class requirement exists precisely to prevent the creation of protections broader than what the Constitution itself confers.

Berenson offers no response to *any* of this controlling authority. Instead, he presses the same arguments that were considered and properly rejected below.

18

*First,* Berenson relies nearly exclusively on *Lederman v. Giuliani*, 2007 WL 1623103 (S.D.N.Y. June 5, 2007), arguing that the question of whether a group qualifies as a cognizable class is a fact question for the jury. Br. at 38–39. But as the district court correctly observed, even if *Lederman* withstands the subsequent narrowing of Section 1985(3), it is easily distinguishable. *See* SPA-38–39. *Lederman* involved a formal advocacy group organized around expanding First Amendment protections for street artists. 2007 WL 1623103, at *1. Berenson's proffered class has no such structure: it is not organized, has no leadership, and is defined entirely by the absence of a particular medical choice.

*Second,* Berenson argues that unvaccinated Americans are a cognizable class because they "include[] a disproportionate number of African-Americans, political conservatives, and evangelical Christians." Br. at 39; A-344 (FAC ¶ 252). But the Supreme Court has squarely rejected disparate-impact theories under Section 1985(3). *Bray*, 506 U.S. at 272 n.4. Berenson does not allege that defendants targeted unvaccinated Americans *because* they are African-American, conservative, or evangelical—only that those groups are disproportionately represented in the broader class. That is a non-cognizable disparate impact theory.

*Third,* Berenson misreads both *Bray* and *Gleason* by shifting the focus from the characteristics of the proposed class to his own relationship to it. He invokes *Bray*'s recognition that Section 1985(3) may reach discrimination directed at women

19

"by reason of their sex," and argues that he was targeted "by reason of his status as a representative speaking for and to unvaccinated Americans." Br. at 40. But the question is not whether Berenson claims to speak for a group, but whether the group itself is a class defined by an "inherited and immutable" characteristic. Berenson's proposed class—defined solely by the voluntary decision not to receive a vaccine— is the kind of "share[d] desire" *Bray* rejected. 506 U.S. at 269. Nor does *Gleason* help Berenson: relabeling alleged animus toward his speech as hostility toward a group he purports to represent, Br. at 41–42, does not transform individual targeting into class-based discrimination. If that were enough, the class requirement would collapse, allowing "every class which the artful pleader can contrive." *Butler v. Elle*, 281 F.3d 1014, 1028 (9th Cir. 2002) (quoting *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 928–29 (5th Cir. 1977)).

In short, vaccination status is neither inherited nor immutable, which is why no court has agreed that it can define a cognizable Section 1985(3) class. The district court was correct in joining this judicial consensus.

### B. Berenson Failed to Plead Discriminatory Animus as to Dr. Bourla and Dr. Gottlieb

The district court also correctly held that, even assuming a cognizable class, Berenson failed to plead that Dr. Gottlieb or Dr. Bourla acted with class-based discriminatory animus. SPA-39–41. Section 1985(3) requires that a plaintiff be targeted "not because of any personal malice the conspirators have toward [him], but

because of [his] membership in or affiliation with a particular class." *Gleason*, 869 F.2d at 695. Berenson's own allegations show the opposite.

The allegations of the amended complaint establish that defendants' motives were not class-based. It alleges that defendants sought to limit what they viewed as COVID-19 "misinformation" because they "view[ed] COVID-19 vaccination as a life-saving measure." A-261, A-338 (FAC ¶¶ 19, 229). It further alleges that defendants bore "animus against Mr. Berenson's reporting," A-344 (FAC ¶ 253), and criticizes those who "spread misinformation on Covid vaccines," A-318 (FAC ¶ 177). And it alleges that defendants believed his reporting was "leading to preventable deaths." A-344 (FAC ¶ 253). Those allegations describe concerns regarding the perceived effects of Berenson's speech—not animus toward unvaccinated Americans as a class. That is the individual, content-based targeting *Gleason* held insufficient. 869 F.2d at 695. Nor is the alleged motive "invidious" in the sense required by the statute: a belief that someone's reporting is endangering public health is not the "derogatory" or class-directed animus Section 1985(3) reaches. *See Bray*, 506 U.S. at 274.

The district court correctly recognized as much. SPA-39–41. It held that the amended complaint alleges that defendants focused on Berenson because of the perceived danger of his reporting, not because of his vaccination status, and did not allege that defendants even knew that status, much less acted because of it. SPA-

21

39–40. The district court did not weigh evidence or decline to draw inferences in Berenson's favor. *See* Br. at 41. It accepted all of Berenson's allegations as true, including his own characterization of defendants' motives—that they believed his reporting was "leading to preventable deaths" and bore animus against that reporting. A-344 (FAC ¶ 253). On Berenson's own allegations, the targeted conduct was Berenson's words, not unvaccinated Americans as a class. The failure to plead otherwise is dispositive.

Berenson's reliance on *Bray*'s "saving women" hypothetical, Br. at 43, does not change the analysis. The hypothetical illustrates that even benign motives can support a claim—but only where the defendant acts with "a purpose that focuses upon [the class] by reason of" its defining characteristic. 506 U.S. at 270. The complaint alleges no such focus here. It does not allege that Dr. Gottlieb or Dr. Bourla even knew Berenson's vaccination status, SPA-40, let alone acted because of it.

Berenson tries to fill this gap on appeal by arguing that defendants sought to silence him to "control the class" he purportedly influenced. Br. at 43. That argument repackages alleged animus toward his speech as class-based discrimination—

22

the same attempt that *Gleason* rejected.  869 F.2d at 695.  If hostility toward a plaintiff's message could be reframed as hostility toward a group he claims to represent, the class-based animus requirement would be a dead letter.[4]

Finally, Berenson cannot impute the alleged motives of other defendants to Dr. Gottlieb and Dr. Bourla.  Berenson's animus arguments on appeal rest almost entirely on the conduct of government officials—the "really tough question" White House officials posed at the April 2021 meeting, the "subsequent pressure campaign," and Slavitt's podcast statements about cutting down misinformation reaching unvaccinated Americans.  Br. at 40–41.  But Dr. Gottlieb did not attend the April 2021 meeting, Dr. Bourla had no alleged contact with Twitter, and neither is alleged to have made or endorsed any of those statements.  Each defendant must possess the requisite discriminatory animus—to "have taken his action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *Bray*, 506 U.S. at 275–76.  Berenson's allegations as to Dr. Gottlieb and Dr. Bourla fall well short.

---

[4]    Berenson's amended complaint alleges that Dr. Gottlieb and Dr. Bourla "had financial incentives to silence Mr. Berenson."  A-265 (FAC ¶ 32).  That is not a cognizable theory of invidiously discriminatory animus.  *Scott*, 463 U.S. at 838.

**C.      Berenson Fails to Plead Facts Plausibly Showing that Dr. Gottlieb or Dr. Bourla Engaged in Any Conspiracy**

The district court's dismissal of Berenson's Section 1985(3) claim can also be affirmed on the alternative ground that Berenson fails to plead an actionable conspiracy involving Dr. Gottlieb or Dr. Bourla.  To state a Section 1985(3) claim, a plaintiff must plead facts showing "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003); *see also Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another.").  And because the First Amendment "prohibits only *governmental* abridgment of speech," *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019), Berenson must plead that Dr. Gottlieb and Dr. Bourla—both private citizens—agreed with a then-current government official to violate his constitutional rights.  The amended complaint pleads no such agreement.

Berenson's allegations connecting Dr. Gottlieb and Dr. Bourla to government actors are threadbare.  As to Dr. Gottlieb, Berenson alleged only that Slavitt was in "pretty regular" contact with him during "the winter and spring of 2021," A-312 (FAC ¶ 162), long before any alleged contacts between Dr. Gottlieb and Twitter.  In fact, all of the alleged communications involving Dr. Gottlieb and Slavitt that formed any part of the alleged conspiracy post-date Slavitt's government service.

24

The deficiency is even more acute as to Dr. Bourla: the amended complaint contains no allegation that Dr. Bourla ever communicated with Twitter about anything or that he discussed Berenson (much less Berenson's Twitter account) with any government official. The conspiracy theory against Dr. Bourla rests entirely on his appearance at a public event with President Biden on February 19, 2021, his attendance at a July 28, 2021 White House meeting with unspecified attendees, and his role as CEO of the company on whose board Dr. Gottlieb sits. A-285, A-318 (FAC ¶¶ 98, 178). "It is well settled that claims of conspiracy containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011).

Berenson's reliance on Slavitt as the supposed "linchpin" of the conspiracy does not save his claim. Slavitt left the White House in June 2021. A-303, A-309–10 (FAC ¶¶ 139, 156). The amended complaint contains no allegation that Slavitt discussed Berenson with any federal official after that date—and the communications involving Dr. Gottlieb and Slavitt on which Berenson relies all post-date Slavitt's government service.

In fact, Berenson did not allege that either Dr. Gottlieb or Dr. Bourla ever discussed his Twitter account with any government official, let alone that they agreed with any government official to cause Twitter to violate his First Amendment

rights. At most, the alleged contacts "might demonstrate a meeting of the minds to promptly address" public health issues, but they do not show "a meeting of the minds to violate constitutional rights, let alone [Berenson's] constitutional rights." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1184 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). Berenson cannot cure these deficiencies by pointing to Twitter employees' alleged perception that the defendants' efforts were "coordinated." That kind of third-party characterization is not an "agreement, express or tacit, to achieve the unlawful end." *Webb*, 340 F.3d at 110.[5]

## II. THE DISTRICT COURT CORRECTLY DISMISSED BERENSON'S TORTIOUS INTERFERENCE CLAIM

Under New York law, a tortious interference claim requires "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge

---

[5] The district court did not reach the question whether Twitter's suspension of Berenson's account was "fairly attributable" to the government, *see Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012), and Berenson does not press the issue on appeal. The amended complaint's own allegations defeat any state-action theory. Berenson conceded that Twitter rejected prior third-party requests to action his account—including from White House officials in April 2021. A-277–78, A-283–84, A-296–97 (FAC ¶¶ 74–75, 94, 122–23). He further alleged that Twitter's CEO and general counsel disagreed with his suspension and directed that Berenson's account be reinstated if he exercised his right to appeal under Twitter's Terms of Service. A-331 (FAC ¶¶ 209–10). Those allegations are inconsistent with the state-action theory and squarely within the scope of *Murthy v. Missouri*'s holding that platforms exercising "independent content moderation" do not become state actors merely because government officials communicate with them about misinformation. 603 U.S. 43, 73, 76 (2024).

26

of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019).

The district court dismissed Berenson's tortious interference claim on the ground that he failed to plead any breach of his contract with Twitter. SPA-50–52. That holding is correct and can be affirmed on multiple independent grounds. Dr. Gottlieb's communications with Twitter were also not independently tortious—an alternative ground for affirmance the district court did not reach.

### A. The District Court Correctly Held That Twitter Did Not Breach Any Contract

The district court correctly held that Berenson failed to plead any breach of his contract with Twitter. The court found that Twitter's Terms of Service—which Berenson concedes constituted a binding contract—authorized Twitter to suspend or terminate his account for "any or no reason." SPA-46, SPA-50–51. Applying that provision, and joining "many other courts," the district court held that "account suspensions by Twitter do not amount to a breach of the Terms of Service, because the Terms of Service allow Twitter to suspend or terminate an account for 'any or no reason.'" SPA-51. The court rejected Berenson's argument that the COVID-19 Misleading Information Policy or Borrman's statements modified that authorization,

finding the Policy "aspirational" rather than a binding modification, SPA-48, and Borrman's promise to "try" "too vague to create a contract," SPA-50.

This holding was correct. The Terms of Service authorized Twitter to suspend Berenson's account for "any or no reason"; the COVID-19 Misleading Information Policy did not modify that authorization; Borrman's vague assurances did not create a contract or modify the Terms of Service; and even if the Policy modified the Terms of Service, Twitter did not breach it.

### 1. Twitter's Terms of Service Authorized Suspension for "Any or No Reason"

Berenson concedes that Twitter's Terms of Service permitted Twitter to "suspend or terminate" his account for "any or no reason." A-345 (FAC ¶ 262); SPA-46. Courts have consistently held that such broad discretionary clauses defeat breach claims based on platform suspensions. *See Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132, 137 (11th Cir. 2020) (rejecting tortious interference claim because "Twitter's Terms of Service . . . allow Twitter to ban [plaintiff] from its platform for any reason at all"); *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022) (collecting cases and holding that "Twitter had the contractual right under the Terms to suspend [plaintiff's] account, and his breach of contract claim therefore fails"). As the Northern District of California has put it, "conduct authorized by a contract cannot give rise to a claim for breach of th[at]

28

agreement." *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015).[6] The "any or no reason" clause mandates dismissal of Berenson's tortious interference claim.

### 2. The COVID-19 Misleading Information Policy Did Not Modify the Terms of Service

Berenson's principal argument is that Twitter's COVID-19 Misleading Information Policy modified the "any or no reason" clause and required Twitter to follow a specific five-strike framework before suspending his account. Br. at 44–47. That argument relies entirely on Berenson's previous litigation with Twitter. But this Court should not follow *Berenson* in lieu of the district court's reasoning here.

Twitter's COVID-19 Misleading Information Policy does not contain any enforceable promises, and certainly no promises that superseded the Terms of Service. Nothing in the Policy references the Terms of Service, purports to modify them, or disclaims Twitter's reservation of the right to suspend accounts for "any or no reason." The Policy's text is entirely discretionary. *See* A-484–87. The enforcement

---

[6] New York law, the law of the forum, is in accord. *See In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 102 (2d Cir. 2015) (enforcing "provision allowing [defendant] to terminate the contract for any reason (or no reason)"); *Martin v. Tumblr, Inc.*, 2017 WL 11665339, at *5 (S.D.N.Y. Feb. 10, 2017) (Nathan, J.) (contract claim barred by term permitting termination "for any reason or no reason").

provisions state that the actions Twitter may "take may include" certain conse-quences, and separately reserve the right to suspend accounts outside the strike framework entirely if Twitter "determine[s]" that an account is "dedicated to" pro-moting misleading narratives. A-486–87. Even the section identifying what is "not a violation" of the Policy provides only that certain categories of speech—including "strong commentary" and "[p]ublic debate about the advancement of COVID-19 science"— are "generally not in violation of this policy," and only "[i]n the absence of other policy violations." A-485. This language preserves Twitter's discretion to act on any account at any time and does not guarantee that users who post compliant content will not be suspended. These are the hallmarks of aspiration, not obligation. As the district court correctly held, even if the Policy could be read as a modification, it would not alter Twitter's "unambiguous reservation of the ability to remove con-tent or suspend an account for any reason or *no reason at all*." SPA-49. The district court correctly followed *Morton v. Twitter, Inc.*, which reached the same conclusion on materially indistinguishable facts. 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021). *Morton* held that Twitter's "Non-consensual nudity policy"—which used similar language about how Twitter would respond to violations—did not modify Twitter's Terms of Service. *Id.* at *5–6. And *Morton* follows the general rule that social media platforms' policies do not limit the broad discretion granted in the terms of service. *See, e.g.*, *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *8 (N.D. Cal.

Mar. 31, 2021); *Sweet v. Google Inc.*, 2018 WL 1184777, at *9–10 (N.D. Cal. Mar. 7, 2018); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 38–39 (2021).

This Court should not follow the sole contrary authority Berenson invokes. *Berenson v. Twitter* departed from *Morton* and its progeny by treating the COVID-19 Misleading Information Policy as a binding modification despite the Terms of Service's unambiguous "any or no reason" clause and despite the absence of incorporation language. 2022 WL 1289049, at *2–3. It also relied on a Twitter executive's vague statements as part of a "collective" theory of contractual modification. *Id*. at *3. As shown below, those statements cannot bear that weight. Nor does the "conduct of those involved in deplatforming Berenson" somehow show that Berenson had any enforceable contractual right not to be suspended. Br. at 47. Endeavoring to follow its nonbinding policy in no way negated Twitter's contractual right to suspend Berenson's account for "any or no reason." *See* A-454 ("Twitter's failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.").[7]

---

[7] Berenson mischaracterizes the relevance of the "any or no reason" provision. Berenson portrays the provision as the basis for a contract invalidity defense— and attacks that straw man using dicta from a patent invalidity case. Br. at 47– 48 (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632 (2015)). But Dr. Bourla and Dr. Gottlieb are not arguing that the provision somehow renders Twitter's Terms of Service invalid. To the contrary, the provision granted Twitter the enforceable contractual right to suspend Berenson for "any or no reason"—which Twitter validly exercised without breaching its Terms of Service.

### 3. *Borrman's Vague Assurances Did Not Create a Contract or Modify the Terms of Service*

Berenson next contends that oral statements by Borrman modified the Terms of Service. Br. at 48. The district court correctly rejected that argument. SPA-49–50.

As the district court held, Borrman's statements were too vague to constitute enforceable promises, and did not modify the Terms of Service. Borrman is alleged to have told Berenson in May 2020 that Twitter was "trying to make sure that factual debate finds a way through the emotion." A-279 (FAC ¶ 81). In December 2020, he said the "points you're raising should not be an issue at all" and that Twitter's policy was "designed to allow debate and discussion, but to discourage conspiracy theories." A-282 (FAC ¶ 89). And in March 2021—after the COVID-19 Misleading Information Policy was promulgated—he stated that Berenson's "name has never come up in the discussions around these policies" and that "[i]f it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed." A-283 (FAC ¶ 93).

None of these statements are enforceable promises. And "a true contract cannot exist, however desirable it might be to have one, unless there is a manifestation of assent to the making of a promise." *Desny v. Wilder*, 46 Cal. 2d 715, 735 (1956). As the district court correctly held, "Borrman's promise to 'try' is too vague to create a contract." SPA-50. And Borrman explicitly caveated the only statement that even

32

arguably addressed Twitter's enforcement decisions, telling Berenson that he was "not always made aware of [actions]," A-283 (FAC ¶ 93)—language inconsistent with any guarantee of pre-suspension notice. In any event, oral assurances cannot modify a written agreement that, like Twitter's Terms of Service, specifies how its terms may be modified. *See Starzynski v. Capital Public Radio, Inc.*, 88 Cal. App. 4th 33, 38–39 (2001); *see also* A-453 ("[T]he most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you.").

Moreover, even if Borrman's alleged oral statements somehow did modify the contractually binding Terms of Service, that modification was—itself—superseded. The August 19, 2021 update to the Terms of Service—effective days before Berenson's suspension—expressly provided that "the most current version of the Terms . . . will govern our relationship," that "[n]o advice or information, whether oral or written . . . will create any warranty or representation not expressly made herein," and that Twitter "may suspend or terminate [a user's] account . . . at any time for any or no reason." A-452–453. Even if Borrman's earlier statements had created an enforceable promise, that promise was superseded by the August 2021 Terms.[8]

---

[8] The August 2021 update to the Terms of Service also superseded any prior modification by the COVID-19 Policy.

Finally, even if Borrman's statements had created an enforceable contract and not been superseded by the August 2021 Terms, Berenson did not allege that Dr. Gottlieb knew of those statements. SPA-51. A tortious interference claim requires "actual knowledge of the . . . contractual obligation that was allegedly breached." *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020). Berenson alleges no facts showing that Dr. Gottlieb knew of the private exchanges between Berenson and Borrman. On appeal, he contends only that Dr. Gottlieb knew about the COVID-19 Policy itself, Br. at 48–49—not about Borrman's assurances. That contention is insufficient.

### 4. *Even if the COVID-19 Policy Modified the Terms of Service, Twitter Did Not Breach It*

Even if the COVID-19 Policy modified the Terms of Service, Twitter did not violate it. SPA-52. The Policy expressly contemplated that suspensions might occur in error and provided users with an appeal mechanism to correct such errors. SPA-52. Berenson's allegations confirm this framework: he alleged that Twitter's CEO and general counsel disagreed with his suspension and were prepared to "rescind the strike and restore the account" if he appealed. A-331 (FAC ¶ 210).

The Policy did not guarantee that suspensions would never occur in error—it provided a mechanism to correct them. Berenson argues that the appeal mechanism was illusory because Twitter never notified him of his appeal rights and ultimately did not reinstate him until after he sued. Br. at 49–50. But the Policy did not require

Twitter to provide notice of appeal rights; it provided that users whose accounts were "locked or suspended in error . . . can submit an appeal." A-486. Moreover, Berenson's amended complaint incorporates the Terms of Service themselves which explain "the process for . . . appealing violations." A-447; A-456. Berenson concedes that Twitter's senior leadership decided "[t]he next morning" to "rescind the strike and restore the account" if he appealed. A-257, A-331 (FAC ¶¶ 4, 210). Yet, despite Borrman's repeated requests that Berenson "let [him] know" if he ran into any issues, A-282–283 (FAC ¶¶ 89, 93), Berenson does not allege that he communicated with Borrman about his suspension or exercised his right to appeal under the Terms of Service. On Berenson's own allegations, Twitter's senior leadership promptly directed that Berenson's account be "restore[d]" if Berenson exercised his right of appeal under Twitter's Terms of Service. A-331 (FAC ¶ 210). This is not the conduct of a company that breached its contract—or that was coerced by external pressure. *See Murthy*, 603 U.S. at 60.

## B. Dr. Gottlieb's Communications with Twitter Were Not Independently Tortious

This Court can also affirm because Dr. Gottlieb's communications with Twitter were not "without justification" or improper under New York law. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). Dr. Gottlieb's communications with Twitter—which were good-faith expressions of concern by a physician

35

and former FDA Commissioner about COVID-19 misinformation—are protected by the First Amendment. *See infra* Point III.

Independently, these expressions of concern are not the kind of tortious conduct New York law prohibits. This Court's decision in *Zilg v. Prentice-Hall, Inc.* establishes that a defendant's "expression of views" about an author's writings to a publisher or distributor, "done in good faith and in a non-coercive way, . . . is not tortious." 717 F.2d 671, 678–79 (2d Cir. 1983). This principle resolves this case. Dr. Gottlieb is a physician, a former FDA Commissioner, and a longstanding public voice on vaccination and public health. A-268, A-273, A-311–12 (FAC ¶¶ 44, 64, 160–61). His communications with Twitter were merely one manifestation of his years of public advocacy on these issues—before, during, and after Berenson's tweets. The amended complaint contains no facts showing that these communications were anything other than what they were on their face—good-faith expressions of public health concerns. *See Conte v. Emmons*, 895 F.3d 168, 173 (2d Cir. 2018) (tortious interference claim cannot rest on conduct "incidental to . . . genuine . . . public health and safety concerns"). And reporting content through channels Twitter itself made available to its users cannot constitute tortious interference. *See Illoominate Media, Inc. v. CAIR Found.*, 2019 WL 13168767, at *3 (S.D. Fla. Nov. 19, 2019) (any "suggestion that the mere reporting of a Twitter user . . . is sufficient to constitute tortious interference . . . is, to put it mildly, nonsensical"), *aff'd*, 841 F.

36

App'x 132 (11th Cir. 2020); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 589 (2d Cir. 2005) (the "exercise of [a] contractual right . . . cannot support a claim for tortious interference").

Berenson argued below that Dr. Gottlieb's communications were not made in good faith because they were motivated by "financial" interests. But *Zilg* itself rejected that argument: the DuPont Company in *Zilg* had obvious financial motivations, yet this Court found its communications were in good faith because they reflected a genuine concern about the accuracy of the publication. 717 F.2d at 677–79. The amended complaint here pleads no facts showing that Dr. Gottlieb's concerns about COVID-19 misinformation were anything other than genuine.

## III. THE FIRST AMENDMENT INDEPENDENTLY BARS BERENSON'S CLAIMS

Berenson's complaint against Dr. Gottlieb challenges his communications to Twitter expressing his views about the platform's handling of COVID-19 misinformation. These communications are the expressions of a private citizen on matters of public concern, which lie at the core of the First Amendment's protection. This constitutional protection applies whether Berenson pleads his claims, under Section 1985, in tort, or otherwise.

Berenson challenges only speech. The amended complaint identifies no conduct by Dr. Gottlieb beyond his communications: email to Twitter expressing concern about "dangerous and false narratives on key public health issues related to the

37

pandemic," A-314 (FAC ¶ 167); phone calls with Twitter staff in which he "pressed the company about Mr. Berenson's continued access to the platform," A-263 (FAC ¶ 27); email forwarding Berenson's own tweets and Substack posts, sometimes with Dr. Gottlieb's commentary, A-322, A-324–25, A-327, A-332 (FAC ¶¶ 189, 194, 200, 212); and his stated intention to "discuss[] some of [his] perspectives" on national television, A-316 (FAC ¶ 172). Berenson characterizes the last of these as a "threat[] to use [Dr. Gottlieb's] access to television and media to air his view that Twitter had an 'affirmative obligation'" to moderate the accounts at issue. A-346 (FAC ¶ 264). But that is not a threat. It is protected speech.[9]

"Speech on matters of public concern is at the heart of the First Amendment's protection," and "occupies the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011). This principle squarely protects Dr. Gottlieb here: his alleged communications were directed to a social media platform (Twitter), concerned a self-proclaimed public figure (Berenson), and addressed matters of acknowledged public concern (widely distributed misinformation about public health during a pandemic). *See* A-258, A-291–92 (FAC ¶¶ 9, 112) (alleging that Berenson had "more than 229,000" Twitter followers, "millions

---

[9] The complaint's claims against Dr. Bourla depend entirely on his alleged "knowledge and approval" of Dr. Gottlieb's speech, which Dr. Bourla "never addressed or otherwise distanced himself from." A-333–34 (FAC ¶¶ 214, 216).

38

of viewers" from Fox News appearances, and that his tweets received "more than 1 billion impressions in 2021").

In *Hammerhead Enterprises, Inc. v. Brezenoff*, this Court rejected an analogous attempt to hold a defendant liable under Section 1983 for exercising his own free speech rights to persuade a distributor not to disseminate the plaintiffs' speech. 707 F.2d 33 (2d Cir. 1983). This Court reasoned:

> Having boldly entered the flames of public discussion the First Amendment specifically is designed to kindle, [the plaintiffs] now seek our rescue from the sparks of controversy they ignited. In the absence of any evidence that [the defendant] attempted to do more than express his view concerning the distasteful nature of [the plaintiffs' speech], we decline to come to their assistance.

*Id.* at 35. Like the defendant in *Hammerhead*, Dr. Gottlieb was exercising his "right to expound his belief" that Berenson was tweeting misinformation that "should not be circulated." *Id.* at 40. "Ironically," by seeking to limit that right, Berenson "undermine[s] the very [free speech] principle [he] champion[s]." *Id.* Accordingly, Dr. Gottlieb's communications with Twitter—expressing concern about public health misinformation and urging the platform to act—fall squarely within *Hammerhead*'s holding.

There is no allegation that Dr. Gottlieb threatened punishment, regulatory action, or anything else within his power to impose. He was a private citizen. At most, Berenson alleged that Dr. Gottlieb "threat[ened]" to continue discussing his views

39

on television, A-316 (FAC ¶ 172)—itself the quintessential exercise of First Amendment rights. That is an attempt to convince, not coerce. *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003). The Second Circuit extended *Hammerhead* to tortious interference claims in *Zilg*, holding that "[s]o long as the expression of views is done in good faith and in a non-coercive way, it is not tortious." 717 F.2d at 678–79. These precedents control here. Dr. Gottlieb's alleged communications expressed his genuine views about public health misinformation—views he had expressed publicly for years before and continued to express publicly afterward.

Berenson cannot escape the First Amendment by pleading his claims under state tort law or a federal civil-rights statute. In *Zilg*, this Court held that noncoercive communications urging a publisher to reconsider what it publishes are not actionable no matter the plaintiff's theory of liability. 717 F.2d at 678–79. The Supreme Court has recognized that the First Amendment "can serve as a defense in state tort suits," including claims for "malicious interference with . . . businesses." *Snyder*, 562 U.S. at 451; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 891 (1982). And "heightened First Amendment protections apply to any tort alleging reputational harm as long as the underlying speech relates to a matter of public concern." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 129 (2d Cir. 2013).

This principle extends with equal force to Berenson's Section 1985 claim. *See Barr v. Clinton*, 370 F.3d 1196, 1203 (D.C. Cir. 2004). Were it otherwise, plaintiffs

40

would be free to recast claims for defamation in another form, depriving speech on matters of public concern of the "breathing space" that "[f]reedoms of expression require." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

Most of Dr. Gottlieb's alleged speech is constitutionally protected for the additional reason that it "cannot reasonably be interpreted as stating actual facts about" Berenson that could be false, much less deliberately or recklessly falsified. *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000). Dr. Gottlieb's "argument" that Twitter had an "obligation" to hold "verified accounts" to "some appropriately higher standard" because they "have been granted a special franchise" by Twitter, A-314 (FAC ¶ 169), is on its face an inherently subjective viewpoint. His commentary on a Berenson Substack post critical of Dr. Fauci, A-312, A-333 (FAC ¶¶ 162, 214), was likewise a subjective evaluation, delivered alongside a link that allowed any reader to judge the underlying post independently. To the extent any of Dr. Gottlieb's communications—such as his August 28 email quoting Berenson's own tweet verbatim, A-327 (FAC ¶ 200), or his report that Berenson had switched to another account after being suspended, A-332 (FAC ¶ 212)—could be read as statements of fact, Berenson concedes these statements were true, which is fatal to any theory that they were deliberately or recklessly falsified. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17 (1991); *Chandok v. Klessig*, 632 F.3d 803, 813–14 (2d Cir. 2011).

41

Berenson's opening brief does not address this First Amendment defense. In the district court, he made two arguments, neither of which survives scrutiny. His first argument—that the First Amendment protects only "public" communications, not the "secret" ones alleged here—is contradicted by settled law. "The fact that statements may have been communicated privately does not remove them from the ambit of speech entitled to First Amendment protection." *Dongguk University*, 734 F.3d at 129. *Hammerhead* itself applied that principle, as the challenged communication there was a private letter to individual stores. 707 F.2d at 36–38. Whether Dr. Gottlieb expressed his views in a column for *The Wall Street Journal* or in an email to Twitter makes no First Amendment difference. His second argument—that Dr. Gottlieb's speech was intertwined with government coercion and therefore lost its protected character—fares no better, because Berenson pleads no conspiracy between Dr. Gottlieb and any government official, *see supra* Section I. C., and Dr. Gottlieb's public advocacy on these issues predated any alleged government contact by more than a year.

## CONCLUSION

This Court should affirm the judgment of the district court dismissing Berenson's claims against Dr. Gottlieb and Dr. Bourla with prejudice.

43

Dated:      May 11, 2026          Respectfully submitted,
New York, New York

**DAVIS POLK & WARDWELL LLP**

By: */s/ James P. Rouhandeh*
James P. Rouhandeh
Michael Scheinkman
David B. Toscano
Luca Marzorati
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
212-450-4000

*Attorneys for Dr. Albert Bourla and
Dr. Scott Gottlieb*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 10,058 words as calculated by Microsoft Word, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 11, 2026                          **DAVIS POLK & WARDWELL LLP**
New York, New York

                                              */s/ James P. Rouhandeh*
                                              James P. Rouhandeh