25-2709-cv
*Berenson v. Gottlieb*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

**At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of October, two thousand twenty-six.**

PRESENT:

PIERRE N. LEVAL,
RICHARD C. WESLEY,
JOSEPH F. BIANCO,
*Circuit Judges.*

---

ALEX BERENSON,

*Plaintiff-Appellant*,

v. 25-2709-cv

SCOTT GOTTLIEB, M.D., former FDA Commissioner and member of the Board of Directors of Pfizer, Inc., ALBERT BOURLA, Ph.D., D.V.M., Chief Executive Officer of Pfizer, Inc.,

*Defendants-Appellees*,

ANDREW M. SLAVITT, Senior Advisor to the COVID-19 Response Coordinator, in his official capacity, DONALD TRUMP, President of the United States, in his official capacity, ROBERT

FLAHERTY, Director of Digital Strategy at the White House, in his official capacity, VIVEK H. MURTHY, Surgeon General of the United States, in his official capacity, UNITED STATES OF AMERICA,

*Defendants.*[*]

---

FOR PLAINTIFF-APPELLANT: JAMES R. LAWRENCE, III, Envisage Law, Raleigh, North Carolina.

FOR DEFENDANTS-APPELLEES: JAMES P. ROUHANDEH (Michael S. Scheinkman, David B. Toscano, and Luca Marzorati, *on the brief*), Davis Polk & Wardwell LLP, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (Jessica G. L. Clarke, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court, entered on September 30, 2025, is **AFFIRMED**.

Plaintiff-Appellant Alex Berenson appeals from the district court's dismissal of his complaint against Defendants-Appellees Scott Gottlieb and Albert Bourla, and Defendants Andrew M. Slavitt, Donald Trump, Robert Flaherty, Vivek H. Murthy, and the United States. Berenson, a journalist who reported on the COVID-19 vaccines in 2020 and 2021, alleges that former President Joseph R. Biden, as well as other individuals in the Biden Administration, conspired with executives at Pfizer, Inc. to pressure Twitter to suspend Berenson's Twitter account, because of his views with respect to the COVID-19 vaccines. Based on those

[*] The Clerk of Court is directed to amend the caption as set forth above.

allegations, the complaint asserts the following claims: (1) a violation of his First Amendment rights; (2) a conspiracy to suppress his speech in violation of 42 U.S.C § 1985(3); and (3) tortious interference with his contractual relationship with Twitter. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

## BACKGROUND[1]

Berenson is an independent journalist and author of a book about the COVID-19 pandemic. Berenson was an active Twitter user during the COVID-19 pandemic, posting about, *inter alia*, "the public policy response to COVID-19 and the vaccines." App'x at 291; *see also* Appellant's Br. at 4 (describing Berenson as "a vocal critic of the public policy response to COVID-19, questioning the underlying evidentiary basis for business and school closures"). Berenson's Twitter follower count rose from approximately 7,000 in January 2020 to more than 229,000 by March 2021. Berenson alleges the existence of a conspiracy by the Biden Administration and Pfizer executives "to pressure Twitter to suspend [his] account and mute his voice as a leading COVID-19 vaccine skeptic." App'x at 256; *see also id.* (alleging that the purpose of the conspiracy was "to suppress [] Berenson's First Amendment rights"). This conspiracy allegedly included the following named defendants: President Biden; White House Director of Digital Strategy Robert Flaherty; Surgeon General Vivek Murthy (collectively, the "federal defendants"); White House Senior Advisor for COVID-19 Andrew Slavitt; Pfizer Board

---

[1] In dismissing the claims, the district court considered the allegations in Berenson's proposed First Amended Complaint ("FAC"). Thus, like the district court, we have considered the additional allegations in the FAC in determining whether the claims survive Rule 12(b)(6). *See Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 n.3 (2d Cir. 2010). Accordingly, the following factual background is taken from the FAC and all well-pleaded factual allegations are assumed to be true. *See Horn v. Stephenson*, 11 F.4th 163, 166 (2d Cir. 2021).

of Directors member and former FDA Commissioner Scott Gottlieb; and Chief Executive Officer of Pfizer Albert Bourla.[2]

In May 2020, Twitter announced that it may append labels or warning messages to tweets related to COVID-19 misinformation. Berenson tweeted that he was "concern[ed] about what the new rules might mean for free speech on [Twitter]." *Id.* at 279. In response, Twitter's Vice President of Global Communications Brandon Borrman contacted Berenson to discuss the new policy. In December 2020, Twitter announced a new policy with respect to COVID-19 vaccine misinformation, stating that it would start to "remove Tweets which advance harmful or misleading narratives about COVID-19 vaccinations." *Id.* at 281. Berenson contacted Borrman, "looking for assurances that Twitter would continue to allow his reporting on COVID-19 vaccines." *Id.* at 282. Borrman allegedly responded that the "points [Berenson was] raising should not be an issue at all," and that Berenson should reach out if he "r[an] into any issues." *Id.*

On March 1, 2021, Twitter announced a "five-strike policy" to combat COVID-19 misinformation. Accounts that received strikes were subject to increasing levels of discipline: the first strike resulted in a warning, the second and third strikes each in a 12-hour account lock, the fourth strike in a 7-day account lock, and the fifth or successive strike in permanent suspension. The policy provided that, if a user "believe[s] that [their] account was locked or suspended in error, [the user] can submit an appeal." *Id.* at 486.

The next day, Berenson spoke with Borrman, who allegedly reported that "[Berenson's]

---

[2] Pursuant to Federal Rule of Civil Procedure 25, President Biden was replaced as a defendant by President Donald J. Trump; Slavitt and Flaherty, insofar as they were sued in their official capacities, by the United States of America; and Murthy, insofar as he was sued in his official capacity, by Denise Hinton.

name has never come up in the discussions around these policies," and that Borrman would "try to ensure [that Berenson would be] given a heads up before an action is taken, but [that Borrman was] not always made aware of them before they're executed." *Id.* at 283.

Berenson alleges that members of the Biden Administration, Gottlieb, and Bourla[3] repeatedly pressured Twitter to suspend his account, citing tweets that Twitter executives, including CEO Jack Dorsey and general counsel Vijaya Gadde, did not believe constituted violations of Twitter's five-strike policy. Berenson received strikes from Twitter in March, July, and August 2021. His Twitter account was permanently suspended with the fifth strike on August 28, 2021.

Berenson initiated this lawsuit in April 2023. Slavitt, Gottlieb, Bourla, and the federal defendants each filed a motion to dismiss the FAC. While the motions were pending, the federal defendants requested, and were granted, a stay only as to them. The district court subsequently granted in full the motions to dismiss filed by Slavitt, Gottlieb, and Bourla. Specifically, the district court held that: (1) because Slavitt was a private citizen, Berenson's First Amendment claim against him failed for lack of standing; (2) the Section 1985(3) claim failed because Berenson did not plausibly allege the existence of a recognized protected class or discriminatory animus; and (3) the tortious interference claim failed because Berenson did not allege any breach of contract. *See generally Berenson v. Biden*, 791 F. Supp. 3d 398 (S.D.N.Y. 2025) ("*Berenson I*"). Following the dissolution of the stay, the district court granted the federal defendants' motion to dismiss. *See generally Berenson v. Biden*, No. 23-CV-3048 (JGLC), 2025 WL

[3] Berenson alleges no communication with Twitter on the part of Bourla. Rather, his allegations against Bourla rest primarily on the repeated assertion that, "[u]pon information and belief," Gottlieb "acted with [Bourla's] full knowledge and approval." App'x at 333.

2773968 (S.D.N.Y. Sept. 29, 2025) ("*Berenson II*"). This appeal followed.

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *Principle Homecare, LLC v. McDonald*, 158 F.4th 326, 330–31 (2d Cir. 2025) (per curiam).

On appeal, Berenson argues that the district court erred in dismissing his Section 1985(3) and tortious interference claims against Gottlieb and Bourla.[4] We address each claim in turn.

### I. Section 1985(3)

Section 1985(3) imposes liability on "two or more persons . . . [who] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). A plaintiff must "show that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (alteration in original) (internal quotation marks and citation omitted); *accord Colombrito v. Kelly*, 764 F.2d 122, 130 (2d Cir. 1985). The Supreme Court has cautioned that Section 1985(3) should not be "interpreted as providing a federal remedy for 'all tortious, conspiratorial interferences with the rights of others.'" *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971)). Accordingly, "[i]n order for [the plaintiff's] complaint

[4] At oral argument, Berenson confirmed that his challenge to the dismissal of his First Amendment claim is moot due to his stipulation to the dismissal with prejudice of the federal defendants and Slavitt and Flaherty.

to state a cognizable claim under [Section 1985(3)], it ha[s] to allege that he was a member of a protected class, that the defendants conspired to deprive him of his constitutional rights, that the defendants acted with class-based, invidiously discriminatory animus, and that he suffered damages as a result of the defendants' actions." *Gleason v. McBride*, 869 F.2d 688, 694–95 (2d Cir. 1989); *accord Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).

The Supreme Court has explained that the term "class":

> unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the [Section] 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under [Section] 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993); *accord Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993). Religious, gender, and racial discrimination "certainly fulfill[] the 'class-based animus' requirement of [Section] 1985(3)." *Jews for Jesus*, 968 F.2d at 291; *see also Dolan*, 794 F.3d at 296. In *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983), we held that political parties are also protected groups under Section 1985(3). *Id.* at 386–88. More recently, however, we have noted that, "after our decision in *Keating*, the Supreme Court [in *United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825 (1983),] suggested that the scope of [S]ection 1985 might not extend to include discrimination against political groups except where that discrimination was based on racial animus." *Gleason*, 869 F.2d at 695. In any event, apart from political parties, we have made clear that protected classes under Section 1985(3) need to possess "the type of inherited or immutable characteristics sufficient to satisfy the class-based animus requirement." *Dolan*, 794 F.3d at 296.

Here, Berenson asserts that the relevant class here is a "class of Americans who had chosen not to receive a COVID-19 vaccine, a class of which [] Berenson is apart [sic]." App'x at 344; *see also id.* at 257 (describing the class as "Americans who either had questions about the [COVID-19] vaccine or did not want to be forced to take a shot"). The district court correctly held that Berenson's proposed class does not constitute a class for Section 1985(3) purposes. Instead, this is precisely the kind of class that the Supreme Court cautioned against in *Bray*—a class composed of individuals who share a desire to engage in conduct, *i.e.*, to forgo COVID-19 vaccination, that the defendants allegedly disfavor. To the extent Berenson suggests that the class falls within the ambit of Section 1985 because it "includes a disproportionate number of African-Americans, political conservatives, and evangelical Christians," Appellant's Br. at 39, we are unpersuaded. Even if the composition of the alleged class is accepted as true, we have held that "plaintiffs cannot proceed under a disparate impact theory of liability in . . . claims brought pursuant to [Section 1985]." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012).

The district court also correctly determined in the alternative that, assuming *arguendo* that persons not vaccinated against COVID-19 constituted a protected category, Berenson did not sufficiently allege "that the defendants acted with class-based, invidiously discriminatory animus." *Gleason*, 869 F.2d at 694–95. Berenson argues that the district court misread this Court's reasoning in *Gleason*, and that his claim is dissimilar from that of the plaintiff in *Gleason*. We disagree.

In *Gleason*, we affirmed the dismissal of a Section 1985 claim because the plaintiff "[did] not claim discrimination based on his political party affiliation," but rather "alleged only that he was discriminated against because he was a political opponent of the defendants and was extremely vocal in his opposition to [them]." *Id.* at 695. Here, Berenson alleges that he was

"a highly visible obstacle to [the Biden Administration's] efforts," App'x at 258, and that "the White House had targeted [him] specifically" as "ground zero for COVID-19 misinformation," *id.* at 295. Indeed, the FAC is replete with allegations that Berenson, and not a general class of unvaccinated Americans, was specifically targeted. *See, e.g.*, *id.* at 261 (alleging that Slavitt "secretly and repeatedly urged Twitter to act against [] Berenson"); *id.* at 293 (alleging that, "[b]y mid-April [2021], if not before, [] Berenson had the White House's attention"); *id.* at 345 (alleging that "Defendants deliberately and specifically targeted [] Berenson's journalism and reporting"). The FAC also indicates that Berenson was a vocal critic of the Biden Administration. *See, e.g.*, *id.* at 296 ("Berenson had criticized [] Slavitt for offering a 'conspiracy theory' regarding the number of COVID-19 deaths in Florida."); *id.* at 300 ("[Berenson] specifically criticized President Biden."); *id.* at 301 ("Berenson also directly and aggressively criticized the CDC."); *id.* at 302 ("Berenson had criticized repeatedly Dr. Fauci throughout the COVID-19 pandemic."). Thus, as in *Gleason*, Berenson's Section 1985 claim must be dismissed because he failed to plausibly allege "that the defendants acted with class-based, invidiously discriminatory animus." 869 F.2d at 694–95.

In sum, the district court properly dismissed the Section 1985(3) claim.

## II. Tortious Interference[5]

Under New York law, a claim for tortious interference requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that

[5] The parties do not dispute that New York law applies to the tortious interference claim and, pursuant to the choice-of-law provision in Twitter's Terms of Service, California law applies to the interpretation of that agreement. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31–32 (2d Cir. 2017) (explaining that where "[t]he parties' briefs assume that Connecticut state law governs this case, . . . such implied consent is . . . sufficient to establish the applicable choice of law" (second omission in original) (internal quotation marks and citation omitted)).

contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024) (internal quotation marks and citation omitted). A claim for tortious interference will not lie if the plaintiff fails to plead an actual breach of the contract. *See Kirch v. Liberty Media Grp.*, 449 F.3d 388, 401–02 (2d Cir. 2006).

Here, there was a valid contract between Berenson and Twitter, *i.e.*, Twitter's Terms of Service, which provides that Twitter "may suspend or terminate [a user's] account or cease providing [the user] with all or part of the [contractually defined] Services *at any time for any or no reason*." App'x at 452 (emphasis added). Berenson argues that the Terms of Service were modified by Twitter's five-strike policy and by Borrman's "assurances to [Berenson] regarding his posts pursuant to [the five-strike] policy." Appellant's Br. at 45 (internal quotation marks and citation omitted). The district court rejected these arguments, finding that neither the five-strike policy nor Borrman's statements to Berenson modified the Terms of Service. We agree.

Under California law, "course of performance evidence can supplement, qualify, or modify contrary terms in [a] contract." *Emps. Reins. Co. v. Superior Ct.*, 161 Cal. App. 4th 906, 922 (Ct. App. 2008). However, only when "the subsequent conduct of the parties is *inconsistent* with and clearly contrary to provisions of the written agreement" will there be an implied modification of the original agreement. *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1038 (Ct. App. 2003) (emphasis added), *abrogated on other grounds by Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159 (2005); *see also id.* (describing a "textbook case of modification by conduct" as one where "the parties to the contract not only abandoned or ignored the provisions dealing with the processing of new employees, but, postagreement,

substituted a course of conduct wholly incompatible with those provisions”).

Applying California law, we conclude that Twitter’s five-strike policy and Borrman’s alleged remarks, whether considered separately or together, are not “wholly incompatible” with the Terms of Service. *Id.* at 1038. The relevant provision of the Terms of Service is located in the section entitled “Ending These Terms,” and provides the means by which a user may terminate the agreement, *i.e.*, “by deactivating [a user’s] accounts and discontinuing [a user’s] use of [Twitter’s] Services,” App’x at 451, and the circumstances under which Twitter

> may suspend or terminate [a user’s] account . . . at any time for any or no reason, including, but not limited to, if [Twitter] reasonably believe[s]: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct[;] (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable.

*Id.* at 452. The five-strike policy is clearly among the “Rules and Policies” that the Terms of Service contemplates. *See id.* at 484 (indicating that the URL of Twitter’s “COVID-19 misleading information policy” was “https://help.twitter.com/en/rules-and-policies/medical-misinformation-policy”). However, the provision makes clear that suspension or termination of an account is not limited to violations of that policy; rather, as noted above, such suspension or termination could be “at any time for any or no reason.” *Id.* at 452. Thus, the five-strike policy is not wholly incompatible or inconsistent with the Terms of Service and did not modify it.

We reach the same conclusion with respect to Borrman’s alleged remarks, which are too vague to modify the Terms of Service. The alleged remarks are: (1) “I think you have some nuanced points that could be helpful as [sic] try to move ahead” and “[w]e’re trying to make sure that factual debate finds a way through the emotion, but we’re obviously not successful all the time,” *id.* at 279; (2) “The points you’re raising should not be an issue at all. . . . The policy is

designed to allow debate and discussion, but to discourage conspiracy theories, etc. Please let me know if you run into any issues," *id.* at 282; and (3) "I will say that your name has never come up in the discussions around these policies. . . . If it does I will try to ensure you're given a heads up before an action is taken, but I am not always made aware of them before they're executed. If something happens, please let me know," *id.* at 283. Collectively, even drawing all inferences in Berenson's favor, these remarks suggest *at most* that Borrman would attempt to notify Berenson of action taken against him—not that no action would be taken against Berenson or that Berenson would necessarily receive advance notice of any action.

At bottom, Twitter's Terms of Service provided that Twitter could suspend Berenson for "any or no reason," *id.* at 452, and it did so. There was no modification of that contract and Berenson has failed to allege an actual breach of contract.[6] Therefore, the district court correctly determined that Berenson failed to state a tortious interference claim.

[6] Before the district court and now on appeal, Berenson relies heavily on *Berenson v. Twitter, Inc.*, No. C 21-09818 (WHA), 2022 WL 1289049 (N.D. Cal. Apr. 29, 2022), a decision in a case Berenson initiated against Twitter in December 2021. There, the district court granted in part and denied in part Twitter's motion to dismiss, holding that the five-strike policy and Borrman's "specific and *direct* assurances to [Berenson] regarding his posts pursuant to that policy" "amount[ed] to a modification of the [Terms of Service]" and that Berenson had plausibly alleged that "Twitter's conduct . . . modified its contract with [him] and then breached that contract by failing to abide by its own five-strike policy and its specific commitments set forth through [Borrman]." *Id.* at *2 (emphasis in original). We find that analysis unpersuasive for the reasons stated above.

*    *    *

We have considered Berenson's remaining arguments and conclude that they are without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court